J-A22014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| R.B., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| M.A.G., | |
| Appellee | No. 1213 EDA 2018 |

Appeal from the Order Entered March 22, 2018
In the Court of Common Pleas of Lehigh County
Domestic Relations at No(s): 2015-FC-0991

BEFORE:  BENDER, P.J.E., NICHOLS, J., and STEVENS,  P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED NOVEMBER 29, 2018**

R.B. (Mother) appeals from the custody order entered on March 22, 2018, that awarded Mother primary physical custody of S.G. (born in October of 2005) and R.G. (born in April of 2008) (Children) and partial physical custody to M.A.G. (Father).  Mother and Father were awarded joint legal custody of Children.  After review, we affirm.[1]

> The scope and standard of review in custody matters is as follows:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.  ...  However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.  ...  Thus, an appellate court is

---

[*] Former Justice specially assigned to the Superior Court.

[1] Father, who represented himself at trial, has not filed a responsive brief.

empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

Mother raises the following two issues for our review:

1. Did the trial court abuse its discretion by disregarding the uncontroverted recommendation of the Lehigh County Office of Children and Youth Services [(CYS)]?

2. Were the trial court's conclusions of law unsupported by the competent evidence of record?

Mother's brief at 6.

Here, in its opinion, the trial court set forth an extensive, factual and procedural history of this case and included information relating to the

testimony of the witnesses presented at trial.[2]  In addition, the trial court discussed and applied the custody factors contained in 23 Pa.C.S. § 5328.  The court also provided a supplemental opinion that further explains its reasons for the order it issued on March 22, 2018.  The supplemental opinion also addresses the issues Mother raised in her concise statement of errors complained of on appeal.

It is apparent that Mother's arguments are essentially requesting that this Court re-find facts and re-weigh the evidence.  However, our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012).  Rather, we "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011).

We have reviewed the certified record, Mother's brief, the applicable law, and the thorough, well-reasoned opinions authored by the Honorable Edward D. Reibman of the Court of Common Pleas of Lehigh County, dated March 22, 2018 and May 8, 2018.  We conclude that Judge Reibman's extensive opinions properly dispose of the issues presented by Mother in this

---

[2] The witnesses included Megan Flores, a caseworker for CYS, Children's paternal grandmother, Mother and Father.

appeal. Accordingly, we adopt the court's two opinions as our own and affirm the custody order on that basis.

Order affirmed.
Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/18

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY PENNSYLVANIA
CIVIL DIVISION

*R.B.*

|  |  |  |
|---|---|---|
| **Plaintiff** | ) | FILE NO: 2015-FC-0991 |
| | ) | |
| vs *M.A.G.* | ) | CUSTODY |
| | ) | |
| **Defendant** | ) | Assigned Judge: Reibman, P.J. |
| | ) | |

2018 MAR 22 PM 2:11

## MEMORANDUM OPINION[1]

A custody trial was held on March 19, 2018, on Plaintiff/Mother *R.B.'s*

Petition for Modification, filed on October 31, 2017, and Defendant/Father *M.A.G.'s*

Petition for Contempt, filed on November 17, 2017. Plaintiff/Mother *R.B.*

("Mother") attended with her attorney, Michael E. Brunnabend, Esquire;

Defendant/Father *M.A.G.* ("Father") attended pro se.

Mother is a native of Trinidad; Father is African-American. They were married

on December 17, 2004, and lived together until they separated on December 22, 2015.

Father filed for divorce on October 16, 2015. *G. v. B.*, Lehigh County No.

2015-FC-1403. The Master recommended the entry of a divorce decree on November 7,

2017.

The parties have two children, a daughter, S.G., born 2005, and a son, R.G., born

2008. The parties' separation has been acrimonious marked by a series of actions under

the Protection from Abuse Act and custody conferences. Nonetheless, they managed to

---

[1] This memorandum opinion is filed to comply with the holding in *C.B. v. J.B. and M.B. and T.B.*, 65 A.3d 946, 948 (Pa. Super. 2013) (trial court to address each of the factors set forth in 23 Pa.C.S. § 5328(a) "prior to the deadline by which a litigant must file a notice of appeal, and preferably at the time the custody order is issued or shortly thereafter"). This memorandum opinion may be supplemented with further explication in the event of an appeal.

enter into an agreed order on August 16, and filed on August 17, 2016, whereby they would share legal custody of the children; and, in general, to the extent they could not agree as to physical custody of the children, Mother would have primary custody and Father would have partial custody one night during most weeks and every full weekend, except the second weekend, of the month.

Father resides in Brooklyn, NY, on the third floor of his mother's house. His mother resides on the second floor and his sister operates an insurance business on the first floor. He has no other children. Mother resides in Lehigh County with the children. She has no other children.

Mother's petition for modification is premised solely on certain photographs Father took of the daughter in October, 2015, Pl.'s Ex. 1, when the child was almost ten years old.[2] Mother first became aware of the photographs in late October, 2017. She found disturbing and immediately reported them to the Pennsylvania State Police, which, in turn, delivered them to the Lehigh County Office of Children and Youth Services ("OCYS").

OCYS found the photographs to be "inappropriate," but concluded the child had neither been abused sexually, because she was not photographed in the nude, nor exploited, because the images had not been uploaded to the internet or otherwise disseminated. Both parents had considered enrolling the child in a modeling career, and many photographs were taken of the child, perhaps hundreds, with different clothes and poses to build a portfolio for that purpose. Of the many photographs taken of the child, only those marked Pl.'s Ex. 1 were presented to the court.

---

[2] There was some dispute as to whether the child was 8 or 9 years old when the photographs were taken. Mother testified the memory card on which the images were found was dated October 25, 2015. The child's birthday was October 30, 2005.

2

OCYS concluded its investigation with a finding of "unfounded." Nonetheless, the OCYS caseworker believed Father did not understand how inappropriate the photographs were. Consequently, the caseworker recommended Father have only supervised visitation with the children, undergo a parenting evaluation and, if warranted, protective parenting. Mother has adopted that position as well.

An agreed interim order was entered on January 8, 2018. It provided for Father to have only supervised physical custody of the children one day a week, on either Saturday or Sunday, for a period of time and by a supervisor "to be agreed upon by the parties" with Father being solely responsible for the costs of the supervisor. Father has not seen the children since January, 2018. The parties' relationship continues to be acrimonious; any agreement between them would be highly unlikely.

The photographs, Pl.'s Ex. 1, are inappropriate. Even Father's mother, the children's paternal grandmother, agreed they were inappropriate. However, there was no basis to believe they were anything other than a reflection of poor judgment by Father at the time. The photographs were a small number of many pictures taken that day. There was no evidence that other inappropriate photographs were taken of the child at any other time. There has been no other history of any inappropriate actions, behaviors or comments by Father concerning the child or anyone else. The child was uncomfortable when the photographs were taken, but has no fear or concern regarding Father. There was no evidence at all to lead one to believe the photographs, Pl.'s Ex. 1, were anything other than an isolated event.

Mother will not be criticized for finding the photographs inappropriate and reporting them to the State Police. The photographs are inappropriate. Still, Mother's

3

insistence in limiting Father to supervised visitation is suspect. Her text messages to Father refer to him in language that is worse than "inappropriate." See Deft.'s Exs. 6, 7 & 8. Her texts are foul, gross, disgusting, poisonous and insulting. Worse, it reflects a concerted effort to diminish Father as a man and deprive him of his self-respect. It is difficult to imagine how such hatred of Father cannot affect the children and encourage them to be estranged from him. Such behavior is particularly pernicious when Father, as an African-American male, has no criminal record, holds a steady job and has been involved as a responsible parent in his children's lives.

Mother has an unsettling relationship with ████████████ *R.D.F.*, an inmate at the United States Penitentiary at Waymart, Pennsylvania. She describes him as a friend, like "brother and sister," who she has known since she was 10 years old, from the same social club in Trinidad. She has visited him at the penitentiary in 2014. Deft.'s Ex.1 contains photographs of them holding and hugging each other in ways that might be seen as "inappropriate" for a brother and sister. Deft.'s Ex 2 contains various messages of love he sent to her in 2015 that also seems "inappropriate" for a brother and sister, and a nude drawing of himself with his hands covering his genitalia with a drawing of her beside the drawing of him in what appears to be her glancing at him with obvious satisfaction or pleasure. He has also sent cartoon-like drawings to the children, Deft.'s Ex. 3 & 4, which Mother hung on the wall of their home. At one point, ██████ *R.D.F.* wrote "I will be in Trinidad by December 25th, 2014." Deft.'s Ex. 1. Mother's texts to Father states she will "have a real man helping me;" "I finally have a REAL MAN in my life," and in response to Father's text to Mother to "go to your jail-bird boyfriend and leave me alone with my time with the kids," she wrote "LOL more man than you c—t" and [s]--k better, f—k

4

better." Deft.'s Ex. 6 & 8. Her characterization of her relationship with R.D.F. as "brother and sister" is suspect. Furthermore, she professed incredibly not to know why he is incarcerated, any details of the offense for which he is incarcerated or his release date. She may be a risk to return to Trinidad, or elsewhere, with the children.

Father appears to be a quiet, reserved and passive individual. In order to avoid conflict with Mother, he did not object to her hanging Mr. R.D.F.'s cartoon-like drawings he sent to the children on the wall of the marital home. Rather than appreciating Father's qualities, she belittles him. He appears to be an appropriate father-figure for the children.

Finally, the paternal grandmother described her relationship with the children, and their relationship with her other grandchildren, the children's first cousins. She also described her relationship with Mother in rather charitable terms; Mother did not reciprocate the sentiments. Paternal grandmother was found to be credible, kind, responsible, family-oriented and caring for the children.

Based upon those observations, the order of March 21, 2018, was based upon the application and consideration of the factors set forth in 23 Pa.C.S. § 5328 as follows:

1.) Party more likely to encourage and permit frequent and continuing contact between the child and another party:

> Mother is on a mission to deny Father frequent, continuing and normal contact with the children. Father has done nothing to interfere with Mother's custody of the children.

2.) Present and past abuse committed by a party or member of the party's household; whether there is a continued risk of harm to the child or an abused party; and which party can better provide adequate physical safeguards and supervision of child:
> Despite any abuse between the parties, both of them are capable of

5

providing adequate physical safeguards and supervision of the children.

2.1) Consideration of child abuse and involvement with protective services:
    (a) With respect to child abuse:
        (i) Whether the child is the subject of an indicated or founded report of child abuse.
        (ii) Whether a party or a member of the party's household has been identified as the perpetrator in an indicated or founded report of child abuse.
        (iii) The date and circumstances of the child abuse.
        (iv) The jurisdiction where the child abuse investigation took place.

    A referral to child protective services was determined to be

"unfounded."

(b) With respect to child protective services or general protective services under Chapter 63:

        (i) Whether a party or a member of a party's household has been provided services.
        (ii) The type of services provided.
        (iii) The circumstances surrounding the provision of services.
        (iv) The status of services.
        (v) The date the services were provided.
        (vi) The jurisdiction where the services were provided.

    It was suggested that Father have supervised visitation with the children and undergo a parenting evaluation. He has not undergone such an evaluation, and after trial, it was concluded there was no need to do so.

3.) Parental duties performed by each party on behalf of the child:

    Both parties are capable of meeting the children's physical needs. Father is capable of meeting the children's need for a full relationship with Mother. Mother has used the one instance of Father's lapse of judgment to undermine his relationship with the children.

6

4.) Need for stability and continuity in child's education, family life and community life:

The children will benefit with regular, on-going contact with both parents.

5.) Availability of extended family:

Mother has no extended family in the Lehigh County area. Father has his mother, sister, nieces and nephews in Brooklyn, NY, who have established close relationships with the children.

6.) Child's sibling relationships:

The children get along well with each other and have no other sibling relationships.

7.) Well-reasoned preference of child, based on child's maturity and judgment:

The children were interviewed individually, on the record and, with the parties' permission, outside of their presence. Such interview was helpful, but not determinative, and is being treated as confidential.

8.) Attempts of a parent to turn the child against other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm:

Mother has engaged in behaviors designed to discourage the children from having a normal relationship with Father.

9.) Party more likely to maintain loving, stable, consistent and nurturing relationship with child given child's emotional needs:

Both parents are likely to maintain a loving, stable, consistent and nurturing relationship between themselves and the children.

10.) Party more likely to attend to the daily physical, emotional, developmental, educational and special needs of child:

Both parents are likely to attend to the daily physical, emotional, developmental, educational and special needs of the children.

11.) Proximity of parties' residences:

Mother lives in Lehigh County, PA; Father lives in Brooklyn, NY.

12.) Each party's availability to care for child or make appropriate child-care arrangements:

Both parties are available to care or make appropriate child-care arrangements for the children during their periods of custody.

13.) Level of conflict between parties and their willingness and ability to cooperate with one another:

The level of conflict is high. Father has demonstrated a willingness and ability to cooperate with Mother. Mother has not demonstrated any willingness to cooperate with Father.

14.) History of drug or alcohol abuse of party or member of household:

There was no evidence of drug or alcohol abuse by either party or member of Father's household.

15.) Mental and physical condition of party or member of party's household:

There was no evidence of any mental or physical condition of any party or member of Father's household.

16.) Other:

Primary care giver in past:

Before separation, both parties cared for the children. After
separation, Mother has been the children's primary caregiver.

See 23 Pa.C.S. § 5328.

BY THE COURT:

March 22, 2018

Edward D. Reibman, P.J.

9

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CIVIL DIVISION

R.B.

~~████████████~~,

        Plaintiff,

\- VS -

M.A.G.

~~████████████~~,

        Defendant.

: File No. 2015-FC-0991
: Assigned Judge: Edward D. Reibman

CLERK OF JUDICIAL RECORDS LEHIGH COUNTY, PA

18 MAY -8 PH 12: 50

FILED

## SUPPLEMENTAL MEMORANDUM OPINION

Plaintiff/Mother ~~████████████~~ R.B. ("Mother") appealed timely from the Court's Order of March 22, 2018. A Memorandum Opinion explaining the reasons for the Court's Order was also filed on March 22, 2018. As noted in footnote 1 of that Memorandum Opinion, the Memorandum Opinion was filed prior to the Court having the benefit of the notes of testimony of the trial upon which the March 22 Order was based. This Supplemental Memorandum Opinion further explains the reasons for that Order.

The photographs of the child, taken when she was almost 10 years old, which everyone, including the Court, found to be "inappropriate" remained on the child's computer. They represented a very small number of the hundreds of photographs Father took during a three hour period of which there was no issue. The photographs were taken for the purpose of developing a portfolio for the child's modeling career. The child had been, with the consent of both parents,

involved in modeling. Importantly, the photographs deemed inappropriate were never disseminated by anyone, especially Father. They remained on the child's computer for the two years between when they were taken and when Mother discovered them. Nor has there been any allegation that, in the intervening period of time, Father did anything inappropriate with respect to the child.

The Child Protective Services investigator and the Court found the child to be intelligent and well adjusted. While the child felt uncomfortable when some of the photographs were taken, she expressed no such concern or reservation about Father at the time of trial.

Paternal Grandmother, K.m. was the most well-grounded, mature and responsible adult at trial. She clearly loves the child as well as the child's brother and her two other grandchildren. She did not attempt to defend, apologize or otherwise excuse the "inappropriate" photographs of the child. At the end of her testimony, she tried to be diplomatic if not conciliatory to Mother. She characterized Mother's extended family as "very nice" people and represented she would get along with Mother despite whatever their history had been. Mother would have none of it and rejected outright any overture of conciliation by Paternal Grandmother.

In her Concise Statement of Errors Complained of on Appeal, filed with her Notice of Appeal on April 20, 2018, Mother contends the Court abused its discretion by rejecting the recommendation of the Lehigh County Office of Children and Youth Services ("OCYS"), citing to 23 Pa.C.S. § 5328. A careful reading of § 5328 does not require the court blindly accept the recommendation of OCYS. Rather, the involvement of protective services is one of many factors to be considered in determining the best interests of the child. 23 Pa.C.S. § 5328(a). The

2

recommendation of OCYS was considered carefully; the court determined the incident upon which the recommendation was based was an aberration of Father's long history and involvement with the child, dated in that the photographs were taken two years before trial and no longer necessary given the absence of any allegations of inappropriate contact by Father in that intervening period of time.

Mother also asserts the Court committed "reversible error" by admitting irrelevant testimony regarding Mother's alleged relationship with a federal inmate, _R.D.F._ [redacted]. Although Mother's Concise Statement of Errors Complained of on Appeal represents _R.D.F._ [redacted] was "serving a life sentence without possibility of release," there appears to be no evidence in the record to support that representation. Moreover, _R.D.F._ [redacted] wrote to Mother that he expected to be released from prison in December 2014. N.T., 3/19/18, at 111. And, on September 4, 2015, Mother texted to Father that "soon they [the children] will know what it's like to have a father …". *Id.*, at 117. Mother's alleged relationship with _R.D.F._ [redacted] and his relationship with the children, was considered a "relevant factor" as required by 23 Pa.C.S.A. § 5328(a)(16). It was also considered to evaluate Mother's credibility. She testified that she has had a close relationship with _R.D.F._ [redacted] since she was 10 years old and that between the ages of 10 and 16 or 17, they were with each other on a daily basis. The letters from _R.D.F._ [redacted] and the photographs of him with Mother indicate they maintain a close personal relationship. She characterized that relationship as "brother/sister". *Id.*, at 105, 108. His letters and photographs belie that characterization. Furthermore, Mother testified she did not know why _R.D.F._ [redacted] was in federal prison or when he might be released. *Id.*, at 107. That, too, was difficult to accept as true. Finally, when asked whether she had an affair with _R.D.F._ [redacted], she replied "… I did not

3

have an affair *in general." Id.,* at 113. (Emphasis added.) There was no basis in the record to conclude whether R.D.F. was entitled to have conjugal visits while incarcerated, but Mother's qualification that he did not have an affair *"in general"* seemed evasive.

Finally, at the conclusion of the trial, Father requested to see the children. He had no contact with them since February 15, 2018, when Mother blocked his cell phone number. When the Court directed court staff to bring the children into the courtroom, Mother rose from her chair at counsel table and attempted to bring them in herself, at which point she was told to sit down and allow court staff to bring the children into the courtroom. When the children entered the courtroom, the Court told them their father and grandmother wanted to give them a hug. There was no hesitation or reservation by either child in approaching their father and grandmother and giving them a hug.

Father was awarded partial physical custody of the children as he and Mother may agree or, in the absence of such agreement, then every weekend except the second full weekend of each month, from Friday evening until Sunday evening and from the Wednesday immediately following Mother's custodial weekend until Friday during the children's school year and every weekend except the second full weekend of each month from Friday evening until Sunday evening during the summer. That, significantly, was the custodial arrangement proposed by Father; he made no effort to restrict Mother's custodial time with the children.[1] Mother's proposal that Father only have supervised visitation with the children and his time with them be

---

[1]    Father stated: "... for the wellbeing of our children -- children's development, I seek shared physical custody, or primary physical custody, since ▓▓▓continues to project a very negative influence over our children because of her non-stop hatred directed towards me, which is creating an unloving environment around our children, destroying my relationship with them as a father and as a daddy." *Id.,* at 89. Father's statement that he sought primary physical custody of the children appears to have been the result of confusion. At no other time did he request primary physical custody of the children.

4

them be limited reflected her animus toward Father as evidenced by her texts to him and threats to reveal them on the internet.

BY THE COURT:

May 7, 2018

_____
EDWARD D. REIBMAN, P.J.