**Brett A. KETTERER, Appellee,**

v.

**Nicole L. SEIFERT, Appellant.**

Superior Court of Pennsylvania.

Argued May 23, 2006.
Filed June 20, 2006.

---

534 

Herschel Lock, Harrisburg, for appellant.

Barbara Sumple-Sullivan, New Cumberland, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, and KELLY, JJ.

OPINION BY STEVENS, J.:

¶ 1 Nicole L. Seifert, (hereinafter "Appellant"), appeals from the September 12, 2005, Order of the Court of Common Pleas of Cumberland County denying her Petition for Relocation. We affirm.

¶ 2 The relevant facts and procedural history of this appeal are as follows: On September 3, 2002, Appellant and Brett A. Ketterer, (hereinafter Appellee), agreed to a Temporary Custody Order which granted them shared, joint legal custody of their minor child, S.K., born February 8, 1991. The Order also provided that during the school year, Appellant would have primary physical custody of the child, with Appellee having partial physical custody of him on alternating weekends from Friday at 4:00 p.m. until Sunday at 7:00 p.m., every Tuesday from 4:00 p.m. until 8:00 p.m., and shared equal custody during the summer on a week on/week off basis.

¶ 3 On June 13, 2005, Appellant filed a Petition for Relocation in which she claimed it would be in the best interest of S.K. and her were she permitted to move to California, in that the move would benefit them financially, socially and emotionally, as well as substantially improve the quality of their lives.

¶ 4 The trial court held an evidentiary hearing on Appellant's Petition on September 1, 2005, at which time Appellant testified she was once married to Appellee and the couple divorced on February 19, 1994. N.T., 9/1/05, at 5. Appellant had been married to Richard Alan Seifert, (hereinafter Mr. Seifert), for nearly nine years. N.T., 9/1/05, at 4. The couple has an eight year old daughter who lives with Appellant and S.K. at 679 Laurel Drive, Boiling Springs, PA. N.T., 9/1/05, at 4. S.K. was fourteen years old at the time of the hearing and a ninth grade student in the Cumberland Valley School District. N.T., 9/1/05, at 4. Appellant did not reside with Mr. Seifert, as he was employed in California. N.T., 9/1/05, at 4.

¶ 5 In May of 2005, Mr. Seifert moved to California and began a job with D.R. Horton on June 16, 2005. N.T., 9/1/05, at 4–5. D.R. Horton also has a location in Philadelphia. N.T., 9/1/05, at 34. Prior to his move to California, Mr. Seifert worked as a superintendent for Gateway Construction in Central Pennsylvania and had worked in the construction industry throughout the couple's marriage. N.T., 9/1/05, at 6, 8. Mr. Seifert was periodically laid off between 2001 and 2005, during which time he received unemployment compensation. In 2004, Mr. Seifert's job assignments took him out of state approximately six months. N.T., 9/1/05, at 6–7. For several years prior to trial, Appellant attempted to help Mr. Seifert find alternate employment locally, but no position

matched his skills as a supervisor. N.T., 9/1/05, at 8–9.

¶ 6 As the one who handles the household finances, Appellant became stressed when her husband was not working. Despite Appellant's fears, she admitted the couple owns its own home and never missed a mortgage payment on it. N.T., 9/1/05, at 6–7. Appellant indicated another financial concern with which she grappled was S.K.'s desire to attend college and Appellee's statement he would not provide financial support for him to do so, but rather, would require him to seek financial aid. N.T., 9/1/05, at 18–19. Appellant indicated this "economic need" precipitated her decision to file a petition to relocate. N.T., 9/1/05, at 15.

¶ 7 Appellant has extended family members who reside in Southern California, including her father, brother, uncles, aunts and cousins. N.T., 9/1/05, at 6–7. Two of Appellant's uncles own their own construction firm, though Mr. Seifert does not work for either. N.T., 9/1/05, at 13–14. Several members of Appellant's family also live locally, including her mother and grandmother. N.T., 9/1/05, at 10. Appellant and S.K. have traveled to California annually since 1996, and S.K. had flown by himself twice in the prior year to stay with his grandfather. N.T., 9/1/05, at 11. Mr. Seifert had been residing with Appellant's father in Anaheim, California, just prior to trial.

¶ 8 Appellant had been working part-time as a real estate agent for Exit Realty in Camp Hill for almost a year. N.T., 9/1/05, at 5. She contacted the Department of Real Estate in California and discovered she would simply need to pass an examination to obtain a real estate license there, as her college accredited coursework would apply toward that license. N.T., 9/1/05, at 17. Exit Realty has companies nationwide and the branch in Tame-

cula, California, had assured her employment once Appellant obtains a license. N.T., 9/1/05, at 18. She explained that living apart from Mr. Seifert had made her feel like a single parent and strained her marriage. N.T., 9/1/05, at 15.

¶ 9 At Cumberland Valley High School, S.K. has an independent educational program (IEP) in place to aid him with his reading. N.T., 9/1/05, at 20–21. S.K. is also treated by a local physician and takes Adderall for Attention Deficit Disorder. N.T., 9/1/05, at 42, 56. Appellant consulted with two schools in the district to which she would be relocating in California and forwarded each a copy of the IEP. She felt confident that either of the schools would provide S.K. with instruction comparable to that which he receives in Pennsylvania. N.T., 9/1/05, at 20–21. Appellant admitted Appellee has attended most of the IEP meetings at S.K.'s school and that S.K. has been enrolled in extended summer programs to help him maintain the level of achievement he has attained during the school year. N.T., 9/1/05, at 43.

¶ 10 Were she permitted to relocate with S.K., Appellant would consider the majority of the summer, most of the spring break, and most of Christmas break as an appropriate substitute schedule of partial physical custody for Appellee. N.T., 9/1/05, at 21. Appellant also was willing to share a portion of the transportation costs necessary to effectuate a new custody arrangement. N.T., 9/1/05, at 22. Appellant testified it would be important for her to be allowed to relocate with S.K. so that she could keep her immediate family in tact, and she also stated she respects the wonderful bond S.K. shares with Appellee. N.T., 9/1/05, at 26.

¶ 11 On cross-examination, Appellant acknowledged that she has lived in Cumberland County her entire life and that S.K. has never attended a school in any

other school district. N.T., 9/1/05, at 27–28. Since her marriage to Mr. Seifert, Appellant has had approximately nine different address changes. N.T., 9/1/05, at 28. Appellant also agreed her home is worth approximately $342,000.00. N.T., 9/1/05, at 26.

¶ 12 Appellant explained that Mr. Seifert did not qualify for a superintendent position in California and that he had been working for D.R. Horton as an assistant superintendent. N.T., 9/1/05, at 31. Appellant agreed Mr. Seifert voluntarily terminated his employment with Gateway and when he did so accepted a job in California that paid a base salary of $55,000.00,[1] which was less than the $56,276 he made with Gateway in 2004. N.T., 9/1/05, at 31–33. Appellant also agreed that throughout his employ with Gateway in 2002–2004, Mr. Seifert's income increased significantly. N.T., 9/1/05, at 35.

¶ 13 While Appellant stated she researched the cost of living in California versus that in Pennsylvania and observed property taxes are lower in California, she explained a home comparable to the one in which S.K. currently lives would cost approximately $80,000.00 more there. N.T., 9/1/05, at 39–40. Appellant stated that the family would live "marginally" better in California. N.T., 9/1/05, at 41.

¶ 14 Appellee testified he resides at 55 Hilldale Road, Etters, Pennsylvania, with his wife, Tammy, his stepdaughter, and the couple's son. N.T., 9/1/05, at 70. Appellee explained S.K. enjoys a close relationship with his step brother and sister. N.T., 9/1/05, at 71. He also described his relationship with Appellant a successful one in which the two cooperate and openly communicate in matters concerning S.K. N.T., 9/1/05, at 72.

¶ 15 Appellee stated that on some Tuesdays he has forgone his right to custody of S.K. when the latter has activities, too much homework, or other obligations. N.T., 9/1/05, at 72. During the summer, Appellant and Appellee equally share custody of S.K. by alternating weeks. N.T., 9/1/05, at 72–73. Appellee testified that were Appellant to choose to reside in California, he would assume primary physical custody of S.K. N.T., 9/1/05, at 74.

¶ 16 Appellee described S.K. as a kind, shy, loving young man who after some time and effort had made some close friends in Pennsylvania and who would likely have a difficult transition to life in California. N.T., 9/1/05, at 74–75. Appellee was troubled by the educational impact the move to California would have upon S.K., as well as the dramatic effect it would have upon Appellee's ability to share in his son's high school career. N.T., 9/1/05, at 78–80. Appellee also acknowledged that as a teenager who would enjoy working and likely will make friends in California, S.K. may resent having to travel to Pennsylvania for a significant amount of time in the summer, and Appellee would not want to force S.K. to do so. N.T., 9/1/05, at 94–97.

¶ 17 Mr. Seifert testified that as an assistant superintendent with D.R. Horton, he receives a base salary of $55,000.00, and the company offers a bonus program of $10,000.00 annually which is paid out quarterly. N.T., 9/1/05, at 104. Mr. Seifert turned down two superintendent positions in California which offered him a starting salary of $70,000.00, because he felt D.R. Horton offered him more opportunity for advancement. N.T., 9/1/05, at 119.

¶ 18 Though he denied quitting, Mr. Seifert agreed that his employment with Gateway ended only when he determined

---

1. There was also an opportunity for Mr. Seifert to receive overtime and an annual bonus.

he would be relocating to California. N.T., 9/1/05, at 109, 113. Mr. Seifert explained the average home he is building in California is comprised of 3,000 square feet and valued at approximately $500,000.00; in comparison, his home in Pennsylvania is approximately 2400 square feet and valued at $342,000.00. N.T., 9/1/05, at 115, 26. Mr. Seifert estimated that the cost of living in California is approximately twenty percent more than that in Pennsylvania. N.T., 9/1/05, at 110.

¶ 19 Ms. Perry Lynn Smith testified she is one of the owners and the president of Gateway Construction. N.T., 9/1/05, at 57–58. Ms. Smith testified that Mr. Seifert left Gateway's employment when he was asked by letter to make a decision if he were going to stay with Gateway or move to California. Shortly thereafter, Mr. Seifert informed Gateway he was going to quit. N.T., 9/1/05, at 59. Mr. Seifert had worked for Gateway for ten years and experienced temporary layoffs in the past; when he left Gateway, he earned $22.00 per hour. N.T., 9/1/05, at 60. Throughout the three or four years prior to his leaving Gateway, Mr. Seifert volunteered to be laid off and would work on his personal home. N.T., 9/1/05, at 60. Though he had been required to complete some projects out of state or of the area, Mr. Seifert volunteered for two of them the prior year. N.T., 9/1/05, at 61. Ms. Smith spoke favorably of Mr. Seifert's work and would hire him back. N.T., 9/1/05, at 59.

¶ 20 S.K. testified *in camera* that he would prefer to move to California with Appellant as he shares a closer relationship with his mother, and he felt he could have a lot of fun during custody visits in the summer with his father. N.T., 9/1/05, at 127.[2]

¶ 21 On September 12, 2005, the trial court filed a Memorandum Opinion and Order in which it denied Appellant's Petition for Relocation. On September 21, 2005, Appellant filed a Motion for Post–Trial Relief which the trial court denied on September 22, 2005, in light of its belief that such a Motion was not a necessary prerequisite for filing a direct appeal to this Court. On October 3, 2005, Appellant filed a timely notice of Appeal.

¶ 22 Appellant sets forth the following questions for our review:

Whether the trial court substituted its own rationale, in denying relocation to California, instead of conducting the required *Gruber*[3] analysis?

Whether the trial court's finding, that the proposed move to California would not substantially improve the quality of life for mother and child, was without support in the record?

Whether application of the *Gruber* factors to the record established below results in the conclusion that the proposed move is in the best interest of the child?

Brief for Appellant at 4 (citation added).

¶ 23 As each of the three issues Appellant presents on appeal challenge the trial court's factual findings and conclusions in light of *Gruber*, we shall address them together.

¶ 24 The standard this Court utilizes when reviewing any child custody order is:

---

**2.** The trial court found S.K. to be a "loving, kind, happy boy" who "is a little shy, and appears to be a 'young' fourteen." Trial Court Opinion and Order of Court, 9/12/05, at 2.

**3.** *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434, 439 (1990).

broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported by the record, [sic] and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Geiger v. Yeager,* 846 A.2d 691, 696 (Pa.Super.2004) (*citing Anderson v. McVay,* 743 A.2d 472, 474 (Pa.Super.1999)). Ultimately, the test is "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Dranko v. Dranko,* 824 A.2d 1215, 1219 (Pa.Super.2003) (*quoting Wheeler v. Mazur,* 793 A.2d 929, 933 (Pa.Super.2002)).

¶ 25 With any child custody case, including petitions for modification or relocation, "the paramount concern is the best interests of the child." *Johns v. Cioci,* 865 A.2d 931, 936 (Pa.Super.2004) (citations omitted). Relocation cases must be analyzed on a case-by-case basis and according to the standard set forth in the seminal case of *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990). First, the court must consider the prospective non-economic and economic factors of the move in an effort to determine if it is likely to improve substantially the quality of life for the custodial parent and the child. *Id.* at 439. The custodial parent bears the burden of proof with regard to this first prong. *Id.* at 439. Next, the court must consider both parents' motives and whether the move was motivated by a desire to thwart visitation by and a relationship with

the non-custodial parent. *Id.* at 439. Finally, the court must consider whether realistic, substitute visitation arrangements are available. *Id.* at 439.

¶ 26 In *Gruber,* this Court also required a balancing of interests as follows:

> the custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children.

*Id.* at 438–439.

¶ 27 We further note that:

> A party seeking modification of custody arrangements has the burden to show that modification is in the child's best interest. In evaluating whether a modification of custody is in a child's best interest, the court 'has an obligation to consider all relevant factors that could affect the child's well-being.'

*Johns,* 865 A.2d at 937 (citations omitted).

¶ 28 The fact that a move of a considerable distance will increase the cost and logistical problems of maintaining contact between the noncustodial parent and child will not necessarily preclude relocation when other factors militate in favor of it. *Speck v. Spadafore,* 895 A.2d 606, 610 (Pa.Super.2006). Moreover, our review must focus on whether the trial court properly applied the relevant considerations to the facts of **this** case. We have previously explained that "[t]here is no black letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that must be handled on a case by case basis." *Mealy v. Arnold,* 733 A.2d 652, 655 (Pa.Su-

per.1999)(*quoting Baldwin v. Baldwin,* 710 A.2d 610, 614 (Pa.Super.1998)).

¶ 29 Additionally,

[w]e consistently have held that the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Jackson v. Beck,* 858 A.2d 1250, 1254 (Pa.Super.2004).

¶ 30 "Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest." *Com. ex rel. Pierce v. Pierce,* 493 Pa. 292, 299, 426 A.2d 555, 559 (1981). The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. *McMillen v. McMillen,* 529 Pa. 198, 203, 602 A.2d 845, 847 (1992). The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered. *Id.*

¶ 31 In finding the second and third prongs of the *Gruber* test had been met, the trial court first determined that the integrity of Appellee's motive in seeking to relocate S.K. to California, and the motive of Appellant in seeking to prevent it, were adequate. The trial court also determined that a realistic, substitute arrangement for periods of temporary physical custody for Appellee was available, though it also noted "the regular and beneficial contact that now occurs will be seriously disrupted to [S.K.'s] development." Trial Court Opinion, 9/12/05, at 6. While the trial court acknowledged Appellant had extended family members who resided in California, it ultimately found that the possible economic benefit was the primary force driving Appellant's desire to move there and was not convinced that the move would substantially improve the quality of life for S.K. or Appellee. As such, the court found the first prong of *Gruber* had not been proven. Trial Court Opinion and Order, 9/12/05, at 5–7.

¶ 32 We find the trial court's determination the proposed move would not result in a substantial improvement in the quality of life for Appellant and S.K. is supported by the evidence of record. Though Appellant testified that an "economic need" precipitated her desire to move to California, in fact, Appellant admitted that their life would merely be "marginally better" were they to move to California. Nevertheless, the primary benefit upon which Appellant relies, and a significant amount of the testimony presented at trial, involved the claimed increased employment opportunities available to Mr. Seifert in California.

¶ 33 Both Appellant and Mr. Seifert testified at length about their frustration regarding Mr. Seifert's career path in Pennsylvania and the improvement the California job market would make in their family's life. Interestingly, both Appellant and Mr. Seifert testified as to the latter's inability to find a position in Pennsylvania which matched his level of expertise, yet Mr. Seifert voluntarily chose not to accept a position as a supervisor in California, the title he held at Gateway, which paid a significantly greater salary than his current position affords. Indeed, Mr. Seifert actually earned slightly more in 2004 with Gateway, with whom he voluntarily terminated his employ, than the starting, base salary he was promised by D.R. Horton in California.

¶ 34 Mr. Seifert also admitted that the cost of living is approximately twenty percent greater in California, and a home of a size slightly larger than the family's Pennsylvania residence valued at $342,000.00 would cost approximately $500,000.00 in California. Furthermore, Appellant would not be qualified to work in the real estate field in California until she passed an examination, and she did not present any testimony regarding a certain salary and/or benefits she might receive working in that field in California. As such, despite Appellant's claim that economics was the primary basis upon which she sought to relocate with S.K. to California, it appears the family had been enjoying a higher standard of living in Pennsylvania.

¶ 35 In addition, while both Appellant and Mr. Seifert testified regarding the stress caused by the frequent layoffs he experienced with Gateway, Mr. Seifert had worked in the construction industry throughout the couple's nearly nine years of marriage and despite lapses in employment, had managed to reside in a $342,000.00 home without ever missing a mortgage payment. It is also noteworthy that while Mr. Seifert testified he had searched locally for employment suitable to his skills to no avail, Ms. Smith testified she would hire him back at any time. Also, while Appellant has brothers who work in the construction business and live in California, Mr. Seifert is not employed by either of them and the company for which he works does have a location in Philadelphia; if Mr. Seifert wished to remain with the company, then he could explore the possibility of working and maintaining a residence in Pennsylvania.

¶ 36 Even if the proposed relocation to California were to enhance Mr. Seifert's employment opportunities and ease some of Appellant's financial worries, this Court's concern must be centered upon whether the move is in S.K.'s best interests. A move across the country will not only take S.K. away from his father and step siblings, with whom he shares a close relationship, but also an educational plan that includes the Wilson Reading Program, which Appellant worked diligently to have S.K.'s school implement and under which S.K.'s reading skills are advancing. The school districts that Appellant has contacted do not offer the Wilson Reading Program, and though Appellant expressed a willingness to attend training so that she could administer the final levels of the program to S.K., that methodology has been beneficial to S.K. in the school setting. S.K. is about to enter the final stages of his educational career and his academic prowess during those years will undoubtedly impact his acceptance into post-graduate institutions or his success in the job market.

¶ 37 Furthermore, the parties also testified that the current custody arrangement has been working well for several years and expressed a willingness to work together to amend it when necessary to accommodate S.K.'s involvement in extra-curricular activities. In light of the trial court's finding that while a kind, respectful boy, S.K. also appears to be somewhat immature, we share the trial court's concern that taking him away from a successful educational and custodial plan to move him thousands of miles to a new area would not be in his best interest at this critical time in his development. See Trial Court Opinion, 9/12/05, at 7.

¶ 38 Finally, we understand S.K.'s desire to move to California to be with his mother and his belief that summer visits with his father would be enjoyable; nevertheless, we do not find that his desire to relocate to California is based upon good and substantial reasons. *See McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845, 847

(1992). His testimony has failed to convince this Court that moving to California would serve his "physical, spiritual, and moral well being." *McAlister v. McAlister,* 747 A.2d 390, 394 (Pa.Super.2000).

¶ 39 After considering whether the record evinces advantages to Appellant's relocation request and whether the move shall substantially improve Appellant's and S.K.'s quality of life in light of the *Gruber* factors, we find the trial court did not err in its determination that it is in S.K.'s best interest to remain in Pennsylvania and continue to enjoy the existing custody arrangement the parties have followed since September of 2002.

¶ 40 Order denying Petition for Relocation is affirmed.