J-A05027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MEGAN CURTIS, N/K/A MEGAN O'DONNELL | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| DANIEL LEE CURTIS | : | No. 1991 EDA 2020 |

Appeal from the Order Entered September 21, 2020
In the Court of Common Pleas of Northampton County Civil Division at
No(s):  No. C-48-CV-2011-3363

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED JULY 6, 2021**

Megan Curtis, n/k/a Megan O'Donnell (Mother), appeals from the order, that awarded Daniel Lee Curtis (Father) sole legal and physical custody of the parties' son, M.C. (Child), born in February of 2009, and granted Father permission to relocate with Child from Northampton County, Pennsylvania, to Tennessee.[1]  The order included provisions for mental health counseling for Child, and his remote reunification with Mother.  We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We use the parties' names in the caption "as they stood upon the record of the trial court at the time the appeal was taken" pursuant to Pa.R.A.P. 904(b). We note that recent changes to our Rules of Appellate Procedure provide that "[i]n an appeal of a custody action where the trial court has used the full name of the parties in the caption, upon application of a party and for cause shown, an appellate court may exercise its discretion to use the initials of the parties in the caption based upon the sensitive nature of the facts included in the case record and the best interest of the child."  Pa.R.A.P. 904(b)(2); **see also**
*(Footnote Continued Next Page)*

The record in this matter reflects that the parties were previously married and presently are divorced. On April 12, 2011, Mother filed a complaint for custody of Child. On June 14, 2011, the trial court entered a June 10, 2011 stipulated agreement of the parties as having the same force and effect as a custody order of the court. Thereafter, on September 5, 2012, the trial court entered a stipulation of the parties, dated September 5, 2012, as the custody order of the court. Subsequently, on September 24, 2012, the trial court entered the parties' divorce decree. A number of petitions followed, including a petition for modification of custody that Father filed on March 14, 2013. On April 8, 2014, the trial court entered a stipulated custody order. On September 25, 2014, Father filed a petition for contempt and for modification of the custody order, to which Mother filed an answer and counterclaim. In an order dated July 21, 2015, and entered on July 22, 2015, the trial court modified the prior custody order. Under the July 22, 2015 order, Mother had primary physical custody of Child subject to Father's partial physical custody on alternating weekends.

_____

Pa.R.A.P. 907 (stating that "[w]hen an appeal is filed in a custody action, upon application of a party and for cause shown the appellate court may make a determination that using the parties' initials in the caption is appropriate after considering the sensitive nature of the facts included in the case record and the child's best interest"). These changes to our Rules were approved on October 22, 2020, and became effective January 1, 2021, after the current appeal was filed. Moreover, no party has applied to this Court for the use of initials in the caption. We will, however, refer to the minor involved in this custody dispute as "Child" throughout our decision so as to protect his identity.

Relevant to the instant appeal, on April 12, 2019, Father, acting *pro se*, filed a petition for contempt against Mother. On May 16, 2019, Father's counsel, Joanne Kelhart, Esq., filed a praecipe for her appearance on behalf of Father, and, on May 17, 2019, Father filed a petition for modification of custody order on behalf of Father.

Following continued litigation, during which the trial court ordered Father to have sole physical and legal custody and prohibited contact between Mother and Child pending a psychological evaluation of Mother. Father provided Mother with notice of his proposed relocation with Child to Tennessee,[2] and on June 15, 2020, Mother filed a counter-affidavit opposing Father's relocation. On June 29, 2020, Mother also filed a petition for special relief, seeking restored contact with the Child. The trial court scheduled a hearing on Mother's petition for special relief for July 31, 2020.

On July 31, 2020, Mother left the courthouse before the hearing. Mother's counsel, Mark B. Stanziola, Esq., was present at the hearing, and the trial court heard testimony from a sheriff about Mother's departure from the courthouse. On August 3, 2020, the trial court entered an order denying Mother's petition for special relief due to her failure to appear, and scheduled a September 8, 2020 trial date for resolution of Father's April 12, 2019 petition for contempt, May 17, 2019 petition for modification, and his proposed relocation.

---

[2] The record does not contain a copy of Father's notice of proposed relocation or any other filings pursuant to Pa.R.C.P. 1915.17(f).

On August 13, 2020, the trial court convened a hearing on a motion for *pro se* representation filed by Attorney Stanziola. After the hearing, the trial court entered an order directing Attorney Stanziola to continue to represent Mother until the court granted him leave to withdraw.

On September 8, 2020, the trial court held the hearing on the several pending petitions and request for relocation. Father was present with his counsel. He presented the testimony of Child and testified on his own behalf. Father's counsel called Mother as a hostile witness on cross-examination. Father also presented the testimony of his current wife, B.C. (Stepmother). Mother was present with her counsel and testified on her own behalf.

Thereafter, on September 21, 2020, the trial court entered the order awarding Father sole legal and physical custody of Child and granting Father permission to relocate to Tennessee with Child. The order included provisions for Father to obtain a new therapist for Child, after which Mother and Child could communicate by video chat under the supervision of the therapist. The trial court also required that the therapist provide written reports regarding the progress of the contact between Mother and Child within six months.

On October 16, 2020, Mother timely filed a notice of appeal. On October 26, 2020, Mother filed a concise statement of errors complained of on appeal. **See** Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

---

[3] We note the late filing of Mother's concise statement of errors complained of on appeal, but decline to find waiver as it does not run contrary to an order of
*(Footnote Continued Next Page)*

On appeal, Mother raises one issue, as follows:

1. Did the Trial Court commit an error of law and abuse its discretion by concluding that [F]ather be allowed to relocate out-of-state[,] thereby prejudicing [M]other's ability to unify with [C]hild, contrary to the testimony and evidence at [the] time of trial.

Mother's Brief at 8.

Mother focuses her argument on the order granting relocation. Mother acknowledges that the trial court order "does direct remote therapeutic involvement between Child and Mother." *Id.* at 18. However, she maintains that the order fails to provide any actual reunification mechanism and any realistic possibility of preserving and fostering of the relationship between Mother and Child. *Id.*

Mother further asserts that the trial court's grant of Father's request for relocation, which was contrary to the statutory directives for the court to preserve and foster the relationship between the non-custodial parent and the child, resulted in undue prejudice to her. *Id.* at 18-19. In support, Mother

---

this Court or the trial court, and no party had raised any allegation of prejudice. *See In re K.T.E.L.*, 983 A.2d 745, 747-48 (Pa. Super. 2009) (finding that the appellant's failure to simultaneously file a Rule 1925(b) concise statement did not result in waiver of all issues for appeal where the appellant later filed the statement, and there was no allegation of prejudice from the late filing). *Cf. J.M.R. v. J.M.*, 1 A.3d 902, 907 (Pa. Super. 2010) (holding, prospectively, that an appellant waives issues for appeal by failing to comply with this Court's order directing him to file a Rule 1925(b) Statement within 21 days); *J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (holding that the appellant waived issues for appeal by failing to comply with the trial court's order directing her to file a Rule 1925(b) Statement within twenty-one days).

relies on **Gruber v. Gruber**, 583 A.2d 434, 439 (Pa. Super. 1990). According to Mother, the trial court failed to consider that Father's proposed move was motivated by a desire to frustrate her rights as the non-custodial parent and impede the development of a healthy, loving relationship between her and Child.[4] Mother summarizes her claims as follows:

> During the course of the testimony before the [trial court on September 8, 2020], Father and [Stepmother] revealed that the motivation behind the relocation request from Pennsylvania to Tennessee was to distance themselves and . . . Child from . . . Mother. The [trial court] failed to attribute any weight to this, contrary to the statutory factors, and granted Father's request. By granting Father's relocation request, the [trial court] has thwarted any realistic reunification of Mother and [C]hild and has failed to foster and preserve any future potential development of [a] relationship between Mother and Child.

**Id.** at 11. Therefore, Mother requests this Court to reverse and remand the matter to the trial court as it pertains to Father's relocation and for the trial court "to develop and facilitate the reunification process between [C]hild and Mother." **Id.** at 20.

Father responds that the trial court's conclusion that relocation was in the best interests of Child was supported by a full consideration of Mother's behaviors that were detrimental to Child, Child's contacts with extended family in Tennessee, and the reason for the relocation. Father concludes that the trial court provided a "reasoned and detailed [o]pinon" supporting its findings

---

[4] We note that this Court decided **Gruber** before the enactment of statutory best interests factors in the Child Custody Act, (the Act), 23 Pa.C.S. §§ 5321-5340.

that the evidence warranted relocation while providing for measures for Mother to "rebuild the damaged relationship with [Child.]" Father's Brief at 4.

In custody cases under the Act, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

We have stated:

the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In *M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we stated the following regarding an abuse of discretion standard:

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An

abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T.***, 989 A.2d at 18-19 (citations omitted).

With any custody case decided under the Act, the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S. §§ 5328, 5338. Section 5323 of the Act provides for the following types of awards:

**(a) Types of award.**—After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S. § 5323.

Section 5328(a) of the Act provides as follows.

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by

another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.

Section 5337 of the Act sets forth the procedures and standards for relocation requests. The Act requires the trial court to consider the following in a relocation proceeding:

**(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Moreover, the party proposing relocation has the burden to prove that relocation will serve the child's best interest. 23 Pa.C.S. § 5337(i). Each party, however, has the burden of establishing "the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S. § 5337(i)(2).

Further, we have explained as follows:

When deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors. *E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011). "**All** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647 ,652 (Pa. Super. 2011) (emphasis in original). Section 5337(h) requires courts to

- 11 -

consider all relocation factors. *E.D.*, *supra* at 81. The record must be clear on appeal that the trial court considered all the factors. *Id.*

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, [620 Pa. 727], 70 A.3d 808 (2013). Section 5323(d) applies to cases involving custody and relocation. *A.M.S. v. M.R.C.*, 70 A.3d 830, 835 (Pa. Super. 2013).

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). In a custody action, it is within the trial court's discretion based on the record before it to determine the relevant weight to give each of the factors in a particular case. *M.J.M.*, 63 A.3d at 339.

Here, the trial court addressed Mother's issue as follows:

The parties were married in 2004 and separated in 2010. The current custody order, which was entered on September 27, 2019, provides that Father has sole legal and physical custody of [C]hild and that Mother is to have no contact with [C]hild. Prior thereto, Father was ordered to have partial physical custody every other weekend. Father is seeking an order granting him continued sole legal and physical custody of [C]hild, with permission to move to

- 12 -

. . . Tennessee with [C]hild. Mother opposes relocation, and seeks to have restored contact with [C]hild. Following our consideration of the testimony presented at the September 8, 2020 trial of this matter, we have concluded that the best interests of [C]hild would be served by continuing Father's sole legal and physical custody of [C]hild and permitting Father to relocate to Tennessee with [C]hild with provisions for remote reunification counseling between[C]hild and Mother, for the reasons discussed below.

At trial we found the testimony of [C]hild, the testimony of Father, and the testimony of [Stepmother] to be entirely credible, and the testimony of Mother not to be credible. We note that [C]hild, who is 11 years of age, is a mature and thoughtful young man who exhibited good judgment and insight for his age, and did not appear to be coached in his testimony. We also found the psychological report pertaining to Mother, authored by Ronald Esteve, Ph.D., to be informative and persuasive. Dr. Esteve's report was admitted into evidence by a stipulation of the parties. We have made our decision herein after a thorough consideration of the relevant factors set forth by [Section 5328 and 5337.]

\*   \*   \*

[C]hild presently resides with Father in Nazareth, Pennsylvania. [C]hild has been in Father's sole physical custody since May 2019, when Father picked up [C]hild from Mother's home at the behest of Mother's [current] husband, after Mother had left the home for several days and was out of contact with her [current] husband, [M.O.] Prior thereto, Mother had primary physical custody of [C]hild since the parties' separation, with Father having periods of partial custody every other weekend. [C]hild is currently 11 years old.

[C]hild resided primarily with Mother throughout his life until May 2019. Since the parties' divorce, Mother has remarried to her current husband, with whom she has two children, [L.O.] and [Q.O.]. Those children are 4 and 5 years of age. Mother is a stay[-]at[-]home parent. Her husband is a family physician. She resides in Skippack, Montgomery County, Pennsylvania. Mother's relationship with [her current husband] has been marred over the years by significant arguments, and she has accused him on at least one occasion of physically abusing her. On that occasion in 2013, Mother reported that [her current husband] hit her, choked her, covered her face with a pillow, and caused her to have black

- 13 -

eyes. He was arrested and pled guilty to a misdemeanor offence [sic], the precise nature of which was not disclosed to this [c]ourt. Mother and her [current] husband have not been to counseling and Mother has left the home for a few days at a time on several occasions over the years as a result of their discord, including while [C]hild was at the home. Mother has accused her husband of cutting her off financially as well. Despite this history, Mother reported to Dr. Esteve that there is no violence in her home. At trial she contended that there has been no violence in the home since 2013, but admitted that [C]hild was present in the home during that incident.

In contradiction to Mother's claim, [C]hild testified that while he was living in Mother's home, he would regularly go over to the neighbor's house to spend time after school and on weekends to avoid the marital discord in Mother's home. Based upon these experiences, [C]hild is fearful of returning to Mother's home as he believes this discord would be ongoing. [C]hild reported in his testimony that he did not feel safe in Mother's home as a result of the marital discord, and Mother's behavior. [Mother's current husband] was granted a temporary [Protection From Abuse (PFA) order] against Mother in 2019, but did not pursue a final PFA order. Currently there is a PFA in place against Mother with respect to [Mother's current husband's] two children from his prior marriage. That PFA was obtained by the mother of [Mother's current husband's] older children on their behalf, after Mother recorded and sent to numerous individuals various cell phone videos of herself making abusive remarks about [current husband's] older daughter. One such video was played for the [c]ourt at trial. While Mother acknowledged that the voice on the video sounded like hers and that the video depicted her two youngest children as well as [current] husband in the background, she incredibly and inexplicably denied recording the video and sending it to others, and in fact denied that the events in the video took place at all. The PFA against Mother with respect to her stepchildren was entered on June 8, 2020 for a period of three years. While Mother has not been excluded from her home, [current husband] is not permitted to spend time with his older children in Mother's presence, including in the home that he shares with Mother. No information was reported to the [c]ourt regarding the relationship between [C]hild . . . and [current husband's] older children, who are reportedly 12 years of age.

- 14 -

In Father's home[, C]hild lives with Father and [Stepmother], and two younger siblings, [J., a male,] and [A., a female]. [J.] is 11 years old and is the child of Stepmother's previous marriage. Stepmother has sole legal and physical custody of [J.,] and [J.'s] biological father is not present in [J.'s] life by choice, having left the relationship shortly after [J.'s] birth. Stepmother maintains contact with [J.'s] paternal extended family. [J.] has special needs, as he has Down syndrome. [A.] is three years old, and is the adopted child of Father and Stepmother. [A.] was adopted as an infant. [C]hild has a strong, positive and loving relationship with these siblings.

Stepmother testified that when [C]hild first moved into their home in 2019, he was highly anxious and would behave unlike a typical child, behaving as though trying to "parent" [J.] and [A.] at times. [C]hild reported to Stepmother that he used to "parent" his younger siblings in Mother's home. In response, Father and [S]tepmother explained to [C]hild that his job was to just be a kid and that he could leave the parenting to them. Since living in Father's home, [C]hild's anxiety and worry have decreased significantly and he is behaving like a typical child and he is happy. Father's home is stable and there is no violence or marital discord. [C]hild is currently treating with a therapist. The [c]ourt notes that there was a marked change in [C]hild's demeanor from September [ ] 2019, when the [c]ourt met with him *in camera*, until the September 8, 2020 trial. Whereas he previously appeared anxious, withdrawn and fearful, his present countenance was outgoing, confident, and relaxed.

Father is a stay[-]at[-]home parent, raising his children and taking care of the family home, and he also coaches youth baseball. Stepmother works from home as a project manager for Covance Research Organization, an entity engaged in oncology research studies. Her remote work status has been in place for the last five years, and is unrelated to the current COVID pandemic. Stepmother travels occasionally for work.

Father and Stepmother wish to relocate to Tennessee to be nearer to both of their extended families, including their parents and siblings. Both are originally from that area. If permitted to move to Tennessee, they will reside in Apison, which is in the Chattanooga metropolitan area. Father and Stepmother have looked at several houses in the area and are ready to purchase a home. While they have not yet listed their Pennsylvania home for

sale, they are confident that it will sell quickly. In Tennessee[, C]hild would live within approximately 10 miles of all of Father's and Stepmother's extended family members. [C]hild has several cousins of similar age living there as well as aunts, uncles, and grandparents, with whom he has positive relationships. Stepmother's work with Covance would continue in Tennessee with no change from her work in Pennsylvania given its remote nature. She would travel on occasion to Maryland and Pennsylvania. Father would continue to be a stay[-]at[-]home parent and believes that he would also have youth baseball coaching opportunities in Tennessee.

Father has determined that [C]hild would attend East Hamilton Middle School in Tennessee and that the school is of a very good quality, both for [C]hild['s] and for [J.'s] needs. Father is confident that [C]hild would easily transition to the school there, as [C]hild is outgoing and makes friends easily. School is currently in session in[-]person. While [C]hild previously attended school in Skippack when living with Mother, he easily transitioned to school in Nazareth last fall after Father obtained sole physical custody. At present, [C]hild attends 6th grade at Nazareth Area Intermediate School which [is] being held in a hybrid program of virtual and in-person instruction, and[,] while [C]hild has had some virtual contact with his friends here during the pandemic, this contact has been limited and his friends are not in his present school cohort so he sees them infrequently.

[C]hild is excited about the prospect of moving to Tennessee. He greatly enjoys spending time with his extended family who live there, and the active lifestyle available there, and believes he would enjoy the school there, including the available extracurricular activities. The [c]ourt did not find that [C]hild's testimony had been coached by any of the adults in his life. Father and [S]tepmother believe that a move to Tennessee would be of further aid in lowering [C]hild's anxiety, putting greater physical distance between him and Mother where Mother has repeatedly failed to abide by [c]ourt orders that direct no contact between her and [C]hild. Father intends to establish a relationship with a therapist for [C]hild in Tennessee to continue his counseling.

From the age of four or five until Father obtained sole legal and physical custody one year ago, [C]hild did not have contact with his maternal grandparents, at Mother's insistence, due to her perception that they did not side with her in custody matters

between herself and Father. Maternal [G]randparents live nearby in Pennsylvania. Since Father has had sole legal and physical custody of the Child, he has fostered a relationship between [C]hild and [M]aternal [G]randparents, and intends to continue that relationship via phone calls from Tennessee, as well as occasional visits in Pennsylvania or Tennessee[,] and would permit [C]hild to vacation with [M]aternal [G]randparents. Likewise, Father has attempted over the last year to initiate phone contact between [C]hild and his half[-]siblings [L.O.] and [Q.O.], but was not permitted to do so. This conduct on the part of Father demonstrates his willingness to foster important relationships in [C]hild's life with his maternal family members.

Father testified that he believed the best course of action to support [C]hild's relationship with Mother at this time would be to attempt reunification between Mother and Child via teleconference with a therapist, with the possibility of future visits if Mother gets treatment for her mental health conditions and such contact is recommended by a therapist. However, Father and Stepmother both credibly testified that they would heed any direction from the court regarding contact between Mother and Child. Prior to the entry of the current Order providing for no contact between Mother and Child, Father did arrange for [C]hild to have contact with Mother over the phone but those calls typically ended poorly because of Mother's behavior. As did Father and Stepmother, [C]hild indicated that[,] despite his misgivings[,] he would abide by any [c]ourt order directing contact between Mother and himself. [C]hild also indicated that he would like to have FaceTime contact with [L.O.] and [Q.O.], without interference by Mother in the conversations.

While [C]hild does wish to have a relationship with Mother, this desire is heavily tempered by his fears surrounding Mother's behavior. He indicated that on all recent occasions, Mother's behavior in his presence—whether in person on the phone, or via FaceTime—has been troublesome. He indicated that Mother attempts to make him feel guilty by having emotional outbursts and asking him when he is going to come "home" to see her and his half[-]siblings. On September 13, 2019, following a conference, this [c]ourt initially entered an Order providing for joint legal custody for both parents, with sole physical custody for Father and a provision for reunification counseling for Mother and [C]hild with therapist Terence Brennan. That Order also provided that Mother was permitted to attend [C]hild's soccer games.

- 17 -

Mother failed to appear at the first scheduled session with Mr. Brennan, having gone to California to seek mental health treatment. She did not notify Father, causing Father to bring [C]hild to Mr. Brennan's office unnecessarily, where [C]hild waited anxiously for Mother to appear, wondering if she would arrive and how she would behave if she did arrive. Later that autumn, Mother began shouting at [C]hild after his soccer game when he walked over to see her, which made him sad and afraid. Mother's contact with [C]hild was thereafter removed via the current Order, pending a psychological evaluation, which Mother did not appear for until March 2020. Despite our custody [O]rder directing no contact, as well as a PFA that was in place for six months, Mother continued to appear in places where [C]hild was present including at Father's home, [C]hild's sports, and [C]hild's school. Police were called to remove Mother from the school property. We also believe [C]hild's concerns to be reasonable given our observations of Mother's overwrought behavior in the presence of the [c]ourt on every occasion on which Mother has appeared.

Mother is presently diagnosed with [Attention Deficit Hyperactivity Disorder (ADHD)] and bipolar disorder. While she stated that she has had ADHD since the age of seven, she incredibly contends that she has only had other mental health struggles since 2019. Since April 2019, Mother has been in inpatient mental health treatment at least six times—at an unnamed facility in Maryland in April 2019, at the Brook Glen Behavioral Health clinic in November 2019, at the Horsham clinic in December 2019 and again in January 2020, at the Malvern clinic in December 2019, and at Montgomery County Hospital in August 2020. She also received outpatient treatment at a facility in California in September 2019. Mother currently treats with both a therapist and psychiatrist. She has weekly therapy sessions. She is currently taking four medications for her mental health—Gabapentin, Trileptal, Clonidine, and Vyvanse. This medication was recently adjusted to address Mother's panic attacks, which she reports were being caused by Seroquel that she had been prescribed. Mother reports that she has noticed improvement since her medications were adjusted and claims that her mental health is completely under control now. Despite her past conduct, she believes that she could conduct herself appropriately with [C]hild on the phone. Because of Mother's behaviors, and—as noted by Dr. Esteve in his report— her paranoid state of mind in which she perceives that everyone is against her, Mother and Father are not able to productively communicate with one another regarding [C]hild's needs.

Mother clearly lacks sufficient insight into her mental health condition and, further, into how her behavior has affected her relationship with [C]hild. Moreover, she seems unable to acknowledge having engaged in inappropriate behavior towards [current husband's] children in spite of clear evidence that she did so, including video, which causes the court further concern about her ability to acknowledge her behaviors and conduct herself appropriately.

Taking all of this information into consideration, in light of the statutory factors enumerated above, we find that the best interests of the child would be served by granting Father's request to relocate to Tennessee, with provisions for Mother to attempt to reunify with the Child via remote communication. As in any custody matter, the best interests of [C]hild are the paramount concern of this [c]ourt in determining this matter. ***Tripathi v. Tripathi***, 787 A.2d 436 (Pa. Super. 2001). While the proposed move to Tennessee will certainly affect Mother's ability to have any periods of physical custody in the future, we do not believe that there is a reasonable probability that we would grant Mother any periods of physical custody with [C]hild in the near future, as her conduct and its effect on [C]hild demonstrates that same would not be in [C]hild's best interest. In essence, Mother will have no less contact with [C]hild if he is in Tennessee than she would have if he were to reside in Pennsylvania. In contrast, we believe that the proposed move has significant advantages for [C]hild and Father and his family, as they will be closer to extended family in Tennessee, and [C]hild will be surrounded by a large extended family free of conflict, abuse, and anxiety[-]inducing behaviors in that [C]hild would benefit from a new living environment in many respects, and that he would have a safe, stable living environment with a parent who is able to provide well for all of his physical, emotional, and educational needs. Moreover, placing [C]hild in Father's sole custody will provide [C]hild with greater stability and continuity and will ensure that his relationship with both of his parents and with his extended family is fostered to the greatest possible extent, as Father has demonstrated that he will relationships and provide stability for [C]hild.

We wish to make clear that our determination of custody in this matter is not a penalty against Mother for her mental health

condition, but is solely designed to protect the best interests of [C]hild, which are paramount.

Trial Ct. Op., 9/21/20, at 1-13.

With regard to Mother's contention concerning the trial court's consideration of Father's and Stepmother's motives for relocating, our review confirms that the trial court did consider each party's reason for seeking or opposing the relocation. When viewed in light of the trial court's findings regarding the effect of Mother's behaviors on Child, as well as the other reasons for relocation set forth by Father, Mother's argument that Father's sole or primary motivation was to impair her rights and frustrate her ability to reunify with Child lacks merit. This Court will not disturb the weight that the trial court placed on particular testimonial evidence where there is support by competent evidence in the record. *See C.R.F.*, 45 A.3d at 443; *see also M.J.M.*, 63 A.3d at 339. Accordingly, Mother's challenge to the order granting Father's proposed relocation fails.

Further, although Mother refers to the trial court's failure to provide for any realistic preservation and fostering of the relationship between Mother and Child, Mother provides no further argument that the trial court erred in its consideration of the statutory best interests factors beyond her challenge to Father's motives for relocating with Child. Indeed, Mother offers no other proposals or mechanisms to better foster her reunification with Child. Under these circumstances, we conclude Mother has not demonstrated any

reversible error or abuse of discretion in the trial court's determinations.[5] **See C.R.F.**, 45 A.3d at 443; **Ketterer**, 902 A.2d at 540.

In sum, the trial court here found that the grant of the relocation to Tennessee was in Child's best interests. The court found that Father's motivation for the move was reasonable. The court further found that Child wanted to move and was excited about the move. The court reasoned that Child had no contact with Mother under the existing custody order, and that presently contact between Child and Mother caused him anxiety. The trial court's decision to permit Father to relocate with Child to Tennessee is supported by competent evidence in the record, and we must affirm. **See C.R.F.**, 45 A.3d at 443; **Ketterer**, 902 A.2d at 540. If, in the future, the situation with the remote reunification between Child and Mother is progressing, Mother will be able to seek a modification of the trial court's custody order at that time.

Order affirmed.

---

[5] We acknowledge that the trial court did not expressly provide a separate list of the factors it considered under Section 5328(a) and 5337(h). However, given Mother's failure to assert that the trial court erred in this regard or that it abused its discretion as to any specific factor other than Section 5337(h)(8), we decline to raise this issue *sua sponte* and remand for a supplemental opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/2021