**Gary Martin GEIGER, Jr., Appellant,**

v.

**Jamie Marie YEAGER, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 5, 2004.
Filed March 25, 2004.

Wesley F. Hamilton, Zelienople, for appellant.

Peter E. Horne, New Castle, for appellee.

BEFORE: MUSMANNO,
OLSZEWSKI, and POPOVICH, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 The primary question before us is whether the trial court correctly applied the *Gruber* factors in this relocation case. We conclude that the court did properly apply these factors and we affirm.

*Facts*

¶ 2 On July 12, 1995, Jamie Yeager gave birth to Breanna Marie Geiger. Breanna's father is Gary Martin Geiger, Jr., appellant in this case. While mother and father never married, they lived together in Lawrence County, Pennsylvania with their daughter until their 1998 separation. After this separation, Breanna lived primarily with mother in Lawrence County. Father received partial physical custody rights.

¶ 3 Mother now wishes that she and Breanna may move from Lawrence County, Pennsylvania to Lumberton, North Carolina. She thus petitioned the trial court for a modification of the child custody order. Father, however, opposed the modification and filed a petition for contempt against mother, alleging that she has interfered with his partial physical custody rights. After a hearing, the trial court found that it would be in the best interests of Breanna to allow the relocation and also held that mother did not interfere with father's visitation rights. Hence, mother's petition was granted and father's denied. Father now appeals both determinations.

¶ 4 The relocation hearing took place on October 1, 2002. At this hearing, the trial judge heard testimony from mother, father and several relatives. As will be seen below, mother and father presented testimony that directly conflicted as to: father's role in Breanna's life; mother's willingness to facilitate contact between father and their daughter; and the "integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it." *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434, 439 (1990).

*Mother's Evidence*

¶ 5 Mother's testimony began the hearing. At the time of the hearing, Jamie

Yeager was 23 years old and living with her mother, sister and Breanna in Lawrence County, Pennsylvania. She declared that she is a registered nurse working at a Lawrence County nursing home. Currently she has attained the position of day-shift supervisor over the nurses and staff. This position, however, is in practical terms the highest level she can advance with her current education. While she wishes to pursue a bachelor's degree in nursing, she testified that she could not afford the school without tuition reimbursement from work. Neither her hospital nor the other hospitals in the immediate Lawrence County, Pennsylvania area offer this benefit.

¶ 6 After an investigation into the Lumberton, North Carolina hospital where her own mother used to work, however, Jamie found out that not only does the North Carolina hospital provide financial assistance for higher education, but that it also had job openings. After applying for this North Carolina job Jamie was offered a position as a nurse, subject only to the requirement that she pass the mandated health screening. This job would pay about the same as her current job, but with better benefits (especially with respect to the tuition reimbursement).

¶ 7 Moreover, Jamie testified that she disliked living in the Lawrence County area. According to her, the population was generally older and its economic growth was stagnant. After visiting Lumberton, North Carolina "several times" her impression of the city was the exact opposite of Lawrence County: she found the people there more her age and the economy "growing."

¶ 8 Jamie also has family members living in Lumberton. If allowed to relocate, she and Breanna have already been invited to live in the Lumberton house of her aunt and uncle. This house is a couple of miles from Breanna's proposed school and "within walking distance" of Jamie's workplace. Further, Jamie's aunt and uncle have several children with whom Breanna can play with. Jamie's father also lives in the immediate Lumberton area and Jamie's mother declared that if Jamie moves to Lumberton, she will move also.

¶ 9 Jamie's testimony then moved to the relationship between Breanna and Breanna's father, Gary Geiger. Looking at everything from the time of the hearing, Breanna is a seven year old who is in the second grade. While father's partial physical custody schedule gave him custody over Breanna from 6 p.m. Friday until 6 p.m. Sunday, Jamie testified that his use of the visitation time was inadequate and infrequent. Starting in the year 2001, mother began to keep a diary concerning father's involvement in Breanna's life. This diary was entered into evidence and explained during mother's testimony. According to mother, she provided father with Breanna's T-ball and soccer schedules. With respect to the T-ball, out of "20–some" games Breanna played, father attended "one or two" of these games. Mother attended all of them. Father did not attend any of Breanna's soccer games, even though these games were played on Saturdays (one of the days father was supposed to have physical custody over Breanna).

¶ 10 Mother also kept track of the dates father saw Breanna: from November 2001 until May 2002, father had custody of Breanna a total of 15 days, even though he could have exercised his visitation rights every weekend during this time. It was only during the time from July 2002 to October 2002 (when the modification hearing took place) that father began to frequently exercise these visitation rights. Moreover, mother testified that on the weekends where father was not going to

see Breanna, he would not even call. According to mother, this left Breanna "extremely" disappointed.

¶ 11 Mother also declared that father would hardly ever call Breanna during the week and testified to a period of three months where they could not contact father. Apparently, he had changed residences and telephone numbers without ever telling them. Evidence of a returned letter to this address was introduced by mother. She also introduced telephone records showing repeated calls to father (which she says could only have been done by Breanna) all without answer.

### Father's Evidence

¶ 12 Father first presented the testimony of his wife, Jessica Geiger. According to Mrs. Geiger, father made every attempt to exercise his visitation rights but was continuously thwarted by mother. She testified that father called mother every single weekend in order to acquire custody over Breanna and that, from hearing the telephone conversation from father's end of the phone, mother's response would "be either she had something to do or just no." Further, she testified that if father would come to pick up Breanna for the weekend, mother would turn him away. All of these attempted contacts with Breanna were, according to Mrs. Geiger and father, documented in a journal. This journal, however, was not brought to the hearing.

¶ 13 Father was then called as a witness. He testified that Breanna flourishes when she is in his care. Not only does Breanna get to spend time with her dad, but she also is able to play with his two-year-old son and numerous cousins who live close-by. He also countered almost every one of mother's testimonial assertions. He stated that: he calls Breanna at least every weekend in an attempt to exercise his visitation rights, with mother denying him most times; he never received a soccer schedule; and he did give mother his new telephone number and address when he changed residences.

### The Trial Court's Opinion

¶ 14 The trial court began its analysis by noting that this is mother's second petition for relocation, her first was denied by the trial court in January of 2000. Yet, the court found that several things had changed from 2000 to 2002. To start with, mother now has an offer of employment from a North Carolina hospital where before she did not even have a job prospect in the state. Further, this job would allow mother to continue her education and better her and Breanna's quality of life.

¶ 15 What seems to be even more important to the judge's change of attitude towards the relocation, however, stems from the credibility determinations the judge made of mother and father and the fact that mother has begun to keep records of father's involvement in Breanna's life.

¶ 16 In its January 2000 order, the trial judge found:

> Mother has been generally uncooperative in providing Father with access to Breanna. Mother has been unable to cooperate with Father concerning the child's medical care and custody in the past. Mother has unilaterally made decisions regarding Breanna's medical treatment and has unilaterally canceled Father's partial custody. These facts coupled with Mother's testimony insisting that Father was not actively involved as a partial custodian with Breanna, leads the Court to question her motivation for moving. The Court finds that while Mother's motives are in part to improve the quality of her life through more involvement with her Mother and Sister, the Court also finds that Mother's motive is to defeat Father's partial custodial rights .... Therefore, the

Court finds that it is in Breanna's best interest to not allow Mother to relocate from Pennsylvania to North Carolina with Breanna.

¶ 17 The evidence presented in the October 2002 hearing, as well as the judge's determination that father was "deceptive," changed the court's mind concerning the best interests of Breanna. It found that father's evidence showing his participation in Breanna's life was questionable. The judge did not believe the testimony that father would call Breanna often and attempt to exercise his custody rights every weekend, only to be denied by mother. The court then held that, based on the mandate of *Gruber*, mother's relocation petition should be granted.

**Standard of Review**

¶ 18 We must now review this determination. The standard we use when reviewing any child custody order is

broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported by the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Anderson v. McVay*, 743 A.2d 472, 474 (Pa.Super.1999).

**Analysis**

¶ 19 The majority of relocation cases we receive are difficult. As the *Gruber* court observed, these cases are wrought with "deep and almost irreconcil-

able competing interests" that our courts must balance in order to achieve the "right" result. *Gruber*, 583 A.2d at 437. The interests that we must accommodate are:

the custodial parent's desire to exercise autonomy over basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children.

*Id.* at 438–39.

¶ 20 While a quick reading of these interests show that they do conflict with one another, it can also be seen that they all boil down to one thing: the best interests of the child. This is the interest we must always keep in mind, whether we are dealing with relocation of a custodial parent or an initial child custody determination. Thus, while *Gruber* sets forth a number of specific factors that are implicated in every relocation dispute, *all* of these factors concern the best interests of the child. *Lee v. Fontine*, 406 Pa.Super. 487, 594 A.2d 724, 725–26 (1991).

¶ 21 With that said, we will reiterate these specific factors that a court must take into account when dealing with the relocation of a custodial parent:

First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent .... Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either

seeking the move or seeking to prevent it .... Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Gruber*, 583 A.2d at 439.

¶ 22 Father begins this appeal by arguing that the trial court incorrectly determined that mother met her burden of proof regarding "the potential advantages of [her] proposed move and the likelihood that the move would substantially improve the quality of life" for both mother and Breanna. *Id.*

¶ 23 To begin, the trial court found that father did not make an attempt to frequently exercise his visitation rights during the school year. The issue of father's visitation was hotly debated; mother presented evidence that showed father *chose* to scarcely exercise his partial custody rights and very rarely called Breanna, father presented evidence in an attempt to show that his limited involvement in Breanna's life was because mother constantly thwarted his visitation rights. One of the two was not being truthful. In this case, the trial court found that it was father who was false and deceptive. In the trial court's own words:

> This Court also finds it necessary to address the parties' testimony regarding visitation .... During the relocation hearing, Mother presented substantial evidence regarding visitation. During her testimony, Mother testified from her notes as well as a calendar detailing Father's visitation and phone calls. Father's evidence, regarding visitation, was limited to testimony from Father, his current wife and his sister-in-law, all of which have an interest in this matter. Although this Court did not find Mother's testimony completely credible re-

garding Father's visitation ..., this Court finds Mother more credible than Father .... Father's credibility is questionable.

¶ 24 With respect to the directly conflicting testimony regarding visitation, it was up to the trial court to make a credibility determination and find out who was being honest and who was not telling the truth. Father now wants us to believe his version of the events: that he attempted to exercise his visitation rights every single weekend but was continuously frustrated by mother. The trial court did not believe him and we, as an appellate court, are not in a position to second-guess that credibility determination. *Armbruster v. Horowitz*, 572 Pa. 1, 8, 813 A.2d 698, 702 (2002). We must thus view mother as the one telling the truth concerning father's limited use of his visitation rights.

¶ 25 If father rarely exercised his visitation rights during the school year, it cannot be said that Breanna's well-being would be shattered if she lived further away; father was not making that much of an attempt to see her anyway. Moreover, the evidence presented by mother shows that while father infrequently saw Breanna from week to week during the school year, father's involvement in Breanna's life increased substantially over the summer of 2002. Thus giving father greater, consecutive custody time during the summer months (as was proposed by mother) might actually increase the role father plays in Breanna's life.

¶ 26 The court also found that the move will further mother's happiness and career. Mother has already secured employment in the same North Carolina hospital where her own mother used to work. While the pay is slightly less than what she currently receives, she testified that she has already advanced as far as she can in her current workplace. More education is needed be-

fore she can open new doors in her career and this education, as mother testified, can only be accomplished if her employer helps pay for it. As she testified, neither her workplace nor the other hospitals in her immediate surrounding area offer the benefit of tuition assistance. The North Carolina hospital at which mother has already been offered a job is the only hospital she found that offers this specific benefit.

¶ 27 Father argues that mother should have investigated more hospitals within Pennsylvania to determine whether these hospitals offer tuition reimbursement. Our caselaw does say this is one factor that must be taken into account in whether to allow the relocation. *Maurer v. Maurer*, 758 A.2d 711, 714 (Pa.Super.2000). Neither *Maurer* nor any other case, however, has required the custodial parent to show that a move is "necessary" before the relocation petition is granted. As *Maurer* makes clear, the fact that a custodial parent fails to fully investigate other job opportunities close by is just one part of the "best interests" determination. Mother thus does not have to show that zero hospitals in the Commonwealth of Pennsylvania offer what she requires and that unless she is able to move to North Carolina her career will be stifled.

¶ 28 Rather, the custodial parent must just demonstrate that relocation would be in the best interests of that parent and the child. Mother has been offered a good-paying job with the specific benefit she seeks, enabling her to further her education. This definitely goes in favor of her best interests and, consequently, Breanna's. *Burkholder v. Burkholder*, 790 A.2d 1053, 1061 (Pa.Super.2002) (*stating:* "the well-being and best interests of the [child is] inextricably joined to the custodial parent's happiness and improved quality of life, whether economic or otherwise"). The fact that mother did not investigate all of the hospitals in the larger area does, according to precedent, lessen the emphasis we must place on this. Yet, it does not, as father wishes, amount to a *per se* invalidation of the relocation petition.

¶ 29 Additionally, mother has a place of residence in North Carolina. She and Breanna will be living in the same house as mother's aunt and uncle. As mother testified, Breanna will have cousins in the house to play with; Breanna's grandfather lives in the immediate Lumberton area; Breanna's private school is close by; and mother's workplace is within walking distance. As the trial court found, "the additional involvement by Breanna's extended family will significantly aid Mother in her rearing of Breanna."

¶ 30 These facts definitely show that mother's life will be improved by the move to North Carolina. Mother's happiness and well-being will in turn better both the economic and non-economic interests of Breanna: economically since mother's increase in her education will translate into increased job opportunities and increased family income; non-economically because mother's ability to go to school again will show Breanna by demonstration that school is very important and worthwhile and because mother's increased welfare will make life happier for Breanna.

¶ 31 Also, as was stated above, Breanna will be living in the same house as mother's aunt and uncle and close by Breanna's grandfather. These family interactions further Breanna's best interests. And, as was already stated, the less frequent but lengthened visitation periods between Breanna and her father might cause father to have an increased part in Breanna's life.

¶ 32 It is clear that "the potential advantages of the move substantially will improve" mother's and Breanna's quality of

life. *Gruber*, 583 A.2d at 439. The trial court did not err in so finding.

¶ 33 Father's next argument is that the trial court abused its discretion in finding mother's motive for the proposed relocation pure. His argument basically boils down to the assertion that there was no way that the trial court could have found that mother's motive for moving to North Carolina was to further her education. He cites to the earlier trial court order in which the court specifically found that mother only wished to move so she could thwart father's visitation rights. This, however, is a credibility determination and as stated above, is a determination with which we will not interfere. Yet, one reason for this change in attitude by the trial court could be because mother began to keep a diary of father's visits and calls and because the trial court generally distrusted father's testimony.

¶ 34 The next argument by father is that the court committed an error of law when it questioned his integrity. Father states that the trial court was judging his fitness as a parent and that his "morals" do not have anything to do with this case. The court, however, was judging father's integrity in order to make a necessary credibility determination. The court stated that father *falsified a court-ordered urine sample* and was later found to have smoked marijuana; while on probation for this offense, father was rearrested on a theft charge and thus violated his probation; and the court found that when questioned about his illegal activities, he testified "in a deceptive manner." All of these findings go to father's credibility as a witness and that was all the court was concerned with.

¶ 35 Father finally argues that the trial court improperly denied his contempt petition since he proved mother frustrated his visitation rights. He further argues that no "realistic, substitute visitation arrangements" can be made because mother demonstrated that she will stand in the way of his custody rights. Again, the trial court did not believe father when he testified that mother interfered with his rights. This concerned father's credibility as a witness and we are bound by the court's credibility determinations.

¶ 36 In conclusion, the trial court did not abuse its discretion when it found that the best interests of Breanna will be served if mother is allowed to move to North Carolina.

¶ 37 Order affirmed.