J-A27021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CATHERINE GILL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SEAN GILL | : | |
| | : | |
| Appellant | : | No. 919 MDA 2022 |

Appeal from the Order Entered June 1, 2022
In the Court of Common Pleas of Cumberland County Civil Division at
No(s):  2021-01203

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:      **FILED: MARCH 21, 2023**

S.G. ("Father") appeals from the order granting C.G. ("Mother") primary custody of their two minor children and permitting Mother to relocate to Texas. Father argues the court erred in weighing the relocation factors and in granting Mother primary custody. We affirm.

Father and Mother were married in 2008. Father served in the National Guard for six years, and, after completing medical school, Mother became a physician for the United States Army. N.T., 5/26/22, at 10, 58-59, 142. Father resigned from the National Guard in late 2013. *Id.* at 63-65, 142, 210. In 2014, while they were living in Virginia, where Mother was stationed, they had their first child. *Id.* at 10, 64.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The family then moved to New York, Mother's next army station. Between 2015 and 2016, Mother was deployed for nine months. *Id.* at 64, 67-68, 160. During Mother's deployment, Father cared for their child. For six months of the deployment, Father and the child lived with the paternal grandparents. *Id.* at 131-32, 173; N.T., 5/27/22, at 9.

When Mother returned, the family moved to Georgia, where the army had stationed Mother. N.T., 5/26/22, at 64. Father went back to school for cyber security management. *Id.* at 65. In 2017, Mother and Father's second child was born.

The family moved to Carlisle, Pennsylvania, Mother's next military post, in 2018. Both parents had hopes that the location would foster familial connections, as Carlisle is within a few hours' drive of both sets of grandparents. *Id.* at 16, 36, 121, 143. Mother was away for three to four months in 2019 for a training session, during which Father cared for the children while he studied. *Id.* at 105-07, 160-61. Father earned his master's degree in December 2019. *Id.* at 164. In 2020, during the pandemic shutdowns, Father watched the younger child and managed the older child's homeschooling. *Id.* at 162-63. Father gained full-time employment in January 2021. *Id.* at 209.

In early 2021, the parties separated, and Mother filed for custody. Mother and Father stipulated to a custody agreement in which they shared equal custody of the children. Their divorce is pending.

In January 2022, Father filed a petition for modification of the custody order. He alleged that Mother had accepted a medical fellowship in Fort Hood, Texas, and that it would not be in the children's best interest to move with Mother. The following month, Mother filed a petition for modification, seeking primary custody of the children during the school year and permission to relocate with them to Texas in June or July of 2022.

The court held a two-day hearing on May 26 and 27, 2022. Mother testified that she is the primary parent. *Id.* at 108. She stated she is more attentive to the children's schoolwork, health, and hygiene, and their doctor and dental appointments. *Id.* at 17, 117. Mother testified that she is the parent who communicates with the children's teachers and coaches and arranges all the extracurricular activities. *Id.* at 18, 38.

Regarding the children's relationships with their grandparents, Mother testified that she does not believe Father can maintain a relationship with the maternal grandparents for purposes of visitation with the children during his custody periods. *Id.* at 127-28, 130. As for the paternal grandparents, Mother testified that she took the children to visit their paternal grandparents when Father stopped talking to them due to their decision to be unvaccinated against COVID. *Id.* at 53-55, 102. Mother stated she has also maintained the children's relationship with the paternal grandparents through calls and video chats. *Id.* at 55-56. Mother testified that she invited the paternal grandparents to attend the older child's first communion, which took place a few weeks before the hearing, after having given Father the opportunity to

- 3 -

invite them. *Id.* at 43, 56; *see also* N.T., 5/27/22, at 28-30 (testifying to her desire to maintain relationship with paternal grandparents).

Mother testified that she has been in the Army for 11 years and is eligible for retirement after 20 years of service. N.T., 5/26/22, at 59. She has achieved the rank of Major. *Id.* at 10. Mother said that she entered the Army after considering what would happen if Father was injured while deployed, and her desire to use her skills to treat injured service members. *Id.* at 58. Mother stated that she and Father had discussed her completing the fellowship in the Army and then transferring to the National Guard or Army Reserves. However, Mother testified that there would be benefits if she stayed in the Army and retired from active duty. *Id.* at 62, 115.

Mother testified that the Army restations her every two or three years, and that there is always the chance she will be deployed. *Id.* at 6, 124. Mother testified that the Army will be diction her soon regardless of whether she participates in the fellowship, and a custody decision would be required either way. *Id.* at 69-71, 78. Mother stated that her current orders were to report to Fort Hood on July 15, 2022. *Id.* at 71.

Mother testified that the family medicine obstetrics fellowship offered in Fort Hood is the only one of its kind, and she has been wanting to do it for her entire career. *Id.* at 71-72; *see also id.* at 78-79 (describing fellowship). She also testified that several former colleagues and mentors are currently stationed at Fort Hood and living in the neighborhood where she intends to move. *Id.* at 77. Mother testified that the fellowship would make her more

marketable when she leaves the Army, and that a similar fellowship would not be available to her as a civilian. *Id.* at 79-80. At the same time, she acknowledged that if she left the military without doing the fellowship, she would not have any trouble finding employment as a physician. *Id.* at 122.

Mother testified that her work schedule during the fellowship would be based on rotations, including some night shifts and 12-hour days. *Id.* at 81. She said she might work 60 or 80 hours in a week. *Id.* at 118-19. Mother testified that the maternal grandmother would move to Texas with her to provide childcare for at least the first year and has co-signed her lease for a house. *Id.* at 36, 74, 84. Mother testified that she enrolled the children in a Catholic school with a curriculum similar to that of their current Catholic school. *Id.* at 87. She said that she will enroll the children in the same types of activities in which they participate in Pennsylvania. *Id.* at 97.

Mother contended that technology will allow the children to have frequent virtual visits with Father and maintain their friendships in Pennsylvania. Mother also explained that the fellowship will permit her to take leave to travel, and that she anticipates taking the children on vacations to visit extended family. *Id.* at 101-02, 127.

When asked whether moving frequently is hard on the children, she stated,

> I think it's challenging on all of us, but it's good to be challenged. Army families, army kids, are known for being very resilient. You know, with those moves come new experiences, new people, new groups of friends, new activities, new cultures. . . . So yes, it's challenging, but in a lot of really good, I think, developmental

ways, and, you know, certainly our oldest is always open to new experiences and challenges. She flourishes in those situations.

*Id.* at 66-67. She testified, "My kids are very easy going and very smart and very social, and I think they will do well with this and any other transitions in the future." *Id.* at 100.[1]

When counsel asked Mother how the long hours she works impacts the children, Mother said,

> You know, obviously it's hard. As I said, kids thrive on routine, so if my schedule's fluctuating they will notice that, but they also know what I do for a living. So they are very proud. They know when mommy's at the hospital that mommy's taking care of people, that mommy's helping people. They are very proud to tell people that.
>
> For the longest time Maggie thought anybody in uniform was a doctor because mommy's a doctor and mommy wears that uniform to work everyday so everyone in uniform must be a doctor. So she is very proud. She likes to talk about what I do. She knows my time spent away from the kids or the family is

_____

[1] Mother similarly testified as follows:

> You know, like I said before, army kids are known for their resiliency. They, you know, are known for having superior social skills and emotional intelligence, and part of that comes from the variety of experiences, living in different places, experiencing different, you know, types of people, new people, growing their sort of awareness of the world.
>
> You know, I think it's important – like I said, it's challenging but challenging is good. I think they'll thrive. The more experiences we provide them, you know – and this is true for all kids in any situation. The more experiences you give them, the more they learn and grow. Eventually they will find their niche, you know, what they want to do or be, but, you know, you need to open their world for them and let them experience it.

N.T., 5/26/22, at 100.

always for the benefit of other people, and she takes as much pride in that as I do, I think.

So, yeah, I mean, you know, they will always be well cared for whether I'm there or not, but they know what I do for work.

*Id.* at 103.

The children's maternal grandmother testified and confirmed that she would move to Texas to assist mother with caring for the children. She said she would relocate or stay after the fellowship, as needed. *Id.* at 225-26.

Father testified that he has been the parent who more often performs primary care for the children. *Id.* at 155. Father testified that he has been the parent to take the children to and from school or daycare, activities, and doctor's appointments. *Id.* at 155-56, 159. He said that before he and Mother separated, he spent most of the parental time with the children and has never gone more than three weeks without seeing them. *Id.* at 150, 158. He stated that now that he and Mother have separate periods of custody, he is equally involved with the children's hygiene as Mother is. *Id.* at 200.

Regarding extended family, Father testified that the paternal grandparents have always been involved in the children's lives. He recounted that he and the older child lived with his parents while Mother was deployed and that the paternal grandfather came to stay with the family for three months when they lived in Georgia, and again for about a week in January 2021. *Id.* at 173-74, 182. Father testified that he had a rift with his parents for several months in 2021 because they would not get vaccinated against COVID, and he cancelled a trip to visit them. *Id.* at 174-75. Father said the

- 7 -

relationship has since been mended. *Id.* at 175. Father testified that he has not had a positive relationship with the maternal grandfather since the two of them got into a physical altercation. *Id.* at 185-86.

Father testified that before he and Mother separated, they had discussed Mother's fellowship, and planned that Father and the children would stay in Carlisle while Mother spent the year in Texas. *Id.* at 144-45. Father said they had also discussed Mother leaving the military following the fellowship, to avoid moving frequently during the remainder of their children's childhoods. *Id.* at 145-47.

Father testified that he is a security specialist for the United States Army at the US Army War College at the Carlisle barracks. He works 40 hours a week, from 8am to 4pm. *Id.* at 137-38. He does not have to travel for his job, and there is no risk that he will be transferred to another location. *Id.* at 138-40. Father testified that there are opportunities for advancement if he moved to the Washington, DC area, but that he has prioritized finding a position that offers him the flexibility to take care of the children. *Id.* at 183-84. Father testified that there is no financial need for the relocation. *Id.* at 196.

Father testified that if Mother relocated to Texas, he would be able to take the children to visit her every month, structured around when the children have three-day weekends due to holidays. *Id.* at 149-52. Father proposed that after the fellowship, Mother could find an Army posting on the East Coast, and they would try to return to a 50/50 custody schedule. *Id.* at 198, 203. He stated if he was granted primary custody and Mother returned

to the East Coast after her fellowship, he would find an adjacent job near where Mother would be stationed. *Id.* at 235.

The children's paternal grandfather testified that the relationship between the parental grandparents with Father is "good" and the relationship with the children is "excellent." N.T., 5/27/22, at 9, 10. He said that the paternal grandparents had had a "tiff" with Father in 2021 over vaccinations, but they had "straightened it out." *Id.* at 10, 16. He stated Mother brought the children to visit the paternal grandparents twice during that period and kept in touch with paternal grandmother. *Id.* at 13, 15. However, the paternal grandfather stated his current relationship with Mother was not positive. *Id.* at 14, 15.

The paternal grandfather confirmed that Father had stayed with them for six months during Mother's deployment, and that he had stayed with Father for a period of months and weeks when Father had operations on his shoulder, wrist, and back. *Id.* at 9. He stated that during one of his visits, Mother would work 12-hour days, and Father would care for the children. *Id.* at 11. He testified that the most recent visit was earlier in the year, shortly after he and Father had started speaking again. *Id.* at 17.

The paternal grandmother also testified and confirmed that her disagreement with Father had passed. *Id.* at 19. She also confirmed that Mother had invited her to the older child's first communion a few weeks before the hearing. *Id.* at 19, 26-27. She stated that Mother brought the children to visit when they were at odds with Father and sent her messages and pictures

of the children during that time, but now questions Mother's motives for doing so, and says their relationship is "not really good." *Id.* at 21-24.[2]

At the conclusion of the hearing, the court stated its decision on relocations "are never easy, especially considering from the testimony I heard you equally love and care for your girls." *Id.* at 30.

The court entered an order granting Mother's request for relocation to Texas. The court also gave Mother primary physical custody of the children. It gave Father physical custody of the children for a portion of their summer break from school, the opportunity to visit the children in Texas one weekend per month during the school year, and alternating holidays. It gave the parties shared legal custody.

The order stated that of the 16 custody factors,[3] the court found 13 factors were neutral or not applicable, two factors (10 and 11) favored Father, and one factor (5) favored Mother. Specifically, the court found that custody factor 10 ("Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child") favored Father, because Father's work schedule "is better suited for and adaptable to the girls' schedules." Relocation Custody Order of Court, 5/31/22, at 18 (unpaginated). It also found custody factor 11 ("The proximity of the residences of the parties") favored Father, because Father's residence is closer

---

[2] Mother and Father each had a friend of theirs testify, as well.

[3] *See* 23 Pa.C.S.A. § 5328(a).

to both paternal and maternal grandparents. However, the court noted that Father's "inability to maintain relationships with extended family is concerning." *Id.*

The court found that custody factor 5 ("The availability of extended family") favored Mother, because, while Father's residence in Pennsylvania is a few hours away from both sets of the children's grandparents and Father's brother, Father has not maintained relationships with extended family members, whereas Mother has fostered those relationships. *Id.* at 15-16. The court noted Mother, not Father, had invited paternal grandparents to attend the older child's first communion. *Id.*

Of the 10 relocation factors,[4] the court found four factors were neutral or not applicable, two factors (1 and 10) favored Father, and four factors (3, 6, 7, and 8) favored Mother. The court found that relocation factor 1 ("The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life") favored Father, because when Mother has worked long hours or been deployed, Father has taken care of the children, "and/or at the very least, [been] more consistent in their lives. The girls have never been removed from their Father, while they have experience not being with their Mother." *Id.* at 12. The court also found relocation factor 10 ("Any other factor affecting the best interest of the child") favored Father,

___

[4] *See* 23 Pa.C.S.A. § 5337(h).

because Father has been a consistent caretaker for the children, while Mother "has been away from the home during months of training and deployment." *Id.* at 14.

The court found that relocation factors 3, 6, 7, and 8 favored Mother. In the court's view, relocation factor 3 ("The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties") favored Mother because "[i]t is more feasible that Father's relationship with the girls will be more easily preserved if the girls relocate than it will be for the Mother's relationship with the girls to be preserved if the girls do not relocate with her." *Id.* at 13. The court considered that Father has a stable job and testified that his work schedule would allow him to fly to Texas to visit the children, whereas it would not be in the children's best interest to visit Mother in Texas on a monthly basis if they remained in Pennsylvania. *Id.* at 12-13.

For relocation factor 6 ("Whether the relocation will enhance the general quality of life for the party seeking relocation, including, but not limited to, financial or emotional benefit or educational opportunity), the court found that both pursuing the fellowship and remaining in the Army for 20 years would improve financial security for Mother, and that moving in accordance with Mother's Army postings "was the family's plan when the parties were married." *Id.* at 14.

For relocation factor 7 ("Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity), the court found that relocating to Texas, "in a neighborhood with other children, in another Catholic school, where maternal grandmother will be available to help care for the girls" would enhance the children's quality of life, and therefore favored Mother. *Id.* at 15. The court noted that "[c]hildren are resilient" and stated, "Moving to another state will enhance their tolerance for those who are different from them, and it will create new challenges and experiences for them." *Id.*

Finally, the court found relocation factor 8 ("The reasons and motivation of each party for seeking or opposing the relocation") favored Mother, because she is moving to better her career. *Id.* The court noted that Father's reasons for opposing the relocation is to keep the children involved in their current school and activities, and to keep them close to their extended family; however, the court noted that Father has not maintained his relationship with his family.

Father appealed. He raises the following issue:

I. Did the trial court abuse its discretion and err as a matter of law in granting Mother's petition for relocation, and thus, permitting a temporary move to Texas, as such decision is inconsistent with the weight of the evidence that shows it is in the best interest of the Children to remain with Father in Pennsylvania while Mother temporarily moves to Texas to pursue a one-year medical fellowship; the record does not establish it is the Children's best interests to be uprooted from their established home and schooling in central Pennsylvania to follow Mother on a temporary move, particularly when Mother failed to establish that such a

temporary relocation would either significantly improve her circumstances economically or the lives of the Children?

>A. Did the trial court abuse its discretion and err as a matter of law in determining that relocation factor #3, "The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parries," favored Mother, as the trial court erred in concluding that Father's relationship with the Children will be more easily preserved if Mother is permitted to relocate temporarily with the Children than Mother's relationship with the Children would be preserved if the Children remained with Father in Pennsylvania?

>B. Did the trial court abuse its discretion and err as a matter of law in determining that relocation factor #7, "Whether the relocation will enhance the general quality of life for the child, including but not limited to, financial or emotional benefit or education opportunity," favored Mother, as Mother failed to meet her burden to prove that allowing her to relocate temporarily with the Children to Texas for a one-year medical fellowship will enhance the general quality of life for the Children, as Mother provided no evidence that the relocation would enhance the Children's opportunities financially, emotionally, socially, or educationally; as Mother provided no evidence that the Children's current living arrangements, schooling or friendship networks would improve by temporarily relocating to Texas where the record established the Children will be cared for by Maternal Grandmother while Mother works 60-80 hours per week during her one year fellowship?

>C. Did the trial court abuse its discretion and err as a matter of law in determining that relocation factor #8, "The reasons and motivation of each party for seeking or opposing the relocation," favored Mother, as Mother's motivation in seeking the relocation was solely to benefit Mother, and not the Children, while Father's motivation opposing the relocation that such temporary relocation was not in the best interest of the Children and did not justify the Children's upheaval from their established location?

Father's Br. at 4-6 (suggested answers omitted).

- 14 -

Father argues that the court determined the custody factors favor Father and "clearly [weigh] in Father's favor as the primary caregiver for the children." *Id.* at 19. Father contends that Mother did not carry her burden to prove that relocation would serve the best interests of the children, and that uprooting the children "from their established home, school, and activities to relocate with Mother to F[ort] Hood, Texas on a temporary basis" is not in the children's best interests. *Id.* at 22. He quotes *Speck v. Spadafore*, 895 A.2d 606, 613 (Pa.Super. 2006), for the proposition that "[w]here a move . . . takes a child away from his other parent, and there are no other advantages to the move, [the Superior Court] simply cannot endorse the decision to grant relocation." *Id.* at 24.

Father more specifically argues the court erred in concluding that relocation factors 3, 6, 7, and 8 weighed in favor of Mother. Father argues the court erred in finding that relocation factor 3 ("the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties") favored Mother, because he has been the children's primary caregiver since their births, and ordering the children to relocate will be destructive to that relationship. He asserts that he assumed all childcare responsibilities while Mother was deployed or in training, once for nine months, and once for three months, and that he has never been away from the children for more than three weeks. He argues that prior to the parties' separation, he predominantly took the children to their medical appointments

and activities and attended their PTO conferences, and that he provided care for the children during the COVID pandemic and while the older child was distance-learning.

Father further argues that he can continue to provide direct care for the children more often than Mother, as his job does not require him to travel or work more than 40 hours per week, and he can work from home at times. Father points out that, in contrast, Mother testified that she will be working 60-80 hours a week, on a rotating schedule, with occasional night shifts and 12-hour days.

Regarding factor 6 ("whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity"), Father argues that Mother did not provide evidence that relocation would improve her quality of life. Father asserts that Mother testified that her work schedule during her fellowship would be demanding, and any benefit to Mother would not occur until after the completion of the fellowship. Father also argues that Mother did not testify that her Army salary would increase after she completed her fellowship.

Father argues the court erred in finding relocation factor 7 ("Whether the relocation will enhance the general quality of life for the child, including but not limited to, financial or emotional benefit or educational opportunity") favors Mother, because Mother presented no evidence that the move would benefit the children. Father asserts that Mother testified the Catholic school in

Texas where she enrolled the children is like the Catholic school in Pennsylvania, and that the children's extracurricular activities would be similar. Father asserts Mother testified that the children's "lifestyle will not change even though the location does." *Id.* at 30 (quoting N.T., N.T., 5/26/22, at 97) According to Father, this testimony supports that the relocation would be a lateral move for the children, at best.

Father also points to his testimony that there was no financial need for the relocation. Father compares the facts of this case with **Ketterer v. Seifert**, 902 A.2d 533 (Pa.Super. 2006), in which Father claims this Court affirmed the trial court's denial of relocation where there was an economic need for relocation, but the relocating party testified the children's lives would only be "marginally better" after the move. *Id.* at 34-35.

Father further argues that while Mother generally testified that children benefit from being exposed to different challenges, she provided no examples specific to the children or Texas. Father argues that the court's finding that relocation will enhance the children's tolerance for other people, cultures and customs is not supported by the record, and based on extrajudicial evidence.

Father also highlights potential negative effects of the move on the children' quality of life. First, according to Father, the parties had chosen to reside in Carlisle due to its proximity to extended family, and the relocation would create a burden on seeing extended family. Father claims the court should not have considered the willingness of maternal grandmother to relocate with the children to be in Mother's favor, because maternal

- 17 -

grandmother testified that she would be equally able to assist if Mother remained in Pennsylvania. Father also testified that the older child has been engaged with her school, friends, and activities — such as soccer, girl scouts, dance, and gymnastics — for the past three years, and that a move would be disruptive. Father also points out that if the Children relocate with Mother, Mother will not have as much time to care for them due to her work schedule, and they will likely need to relocate again once the fellowship is over, "with no guarantee thereafter of where [Mother] will be posted." *Id.* at 32.

Regarding factor 8 ("The reasons and motivation of each party for seeking or opposing the relocation"), Father argues the court erred in concluding this factor favored Mother because Mother sought relocation for her own benefit, and not for the children's benefit. Father asserts that Mother "provided no testimony regarding how the fellowship could affect her future income and Mother provided no evidence that the financial aspects of the betterment of her career would not trickle down to the children unless she obtained primary custody of them for this interim period." *Id.* at 40. Father asserts that while Mother testified that she desired to finish her 20-year career in the Army, for which she had nine years remaining, Mother acknowledged that she could have finished earning for her retirement in the reserve service.

Meanwhile, Father asserts that he opposes the relocation because it is not in the children's best interest. He claims, "By granting the relocation, the trial court removed the children from their established lives, school, activities, friends, and care providers, and relocated them to live 1500 miles away . . .,

in a temporary residence, in the primary care of their maternal grandmother, while Mother works and attends the fellowship." *Id.* at 39-40.

Father also argues the court erred in disregarding Father's opposition to the move on the basis that the children currently live closer to extended family. Father argues that the family choose to move to Carlisle three years ago to be closer to extended family, and that the paternal grandparents have been involved in Children's lives from birth. He claims he testified that the temporary rift with his parents grew out of a concern for the safety of his children during the COVID pandemic, and that the testimony supports that the relationship has since been mended.

In reviewing a custody order, "we accept the factual findings of the trial court that are supported by competent evidence of record[.]" *S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa.Super. 2018). "[W]ith regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa.Super. 2014) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)).

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer***, 902 A.2d at 540 (citation omitted). We therefore do not substitute our judgment for that of the trial court, or determine whether it came to the "right" conclusion. ***Hanson v. Hanson***, 878 A.2d 127, 129, 131 (Pa.Super. 2005). We reject the court's custody decision only if it "involve[s] an error of law, or [is] unreasonable in light of the sustainable findings of the trial court," ***see D.K.***, 102 A.3d at 478 (quoting ***J.R.M.***, 33 A.3d at 650), and "thus, represent[s] a gross abuse of discretion." ***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting ***Bovard v. Baker***, 775 A.2d 835, 838 (Pa.Super. 2001)).

When a party petitions the court to relocate a child's residence[5] and amend custody accordingly, the court must consider both the relocation factors of Section 5337(h) and the custody factors of Section 5328(a). ***S.S.***, 189 A.3d at 1098. Some of these considerations overlap, either expressly or implicitly. ***Id.*** The factors are as follows:

### § 5328. Factors to consider when awarding custody

**(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

---

[5] "Relocation" as defined by the Domestic Relations Code is "[a] change in residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa.C.S.A. § 5322 ("Relocation").

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

## § 5337. Relocation.

. . .

**(h)Relocation factors.**--In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

Guided by these factors, the court must not consider the issue of relocation separate from the issue of custody, but "decide the two issues together 'under a single umbrella of best interests of the children.'" **S.S.**, 189 A.3d at 1098 (quoting **S.J.S. v. M.J.S.**, 76 A.3d 541, 550 (Pa.Super. 2013)).[6] We will affirm where the court "engaged in the proper analysis using both relocation and custody factors, with the best interest standard as the guide." **S.J.S.**, 76 A.3d at 550.

In its opinion, the trial court acknowledges that it is required to consider the relocation and custody factors in tandem, and that the best interest of the child controls. Trial Court Opinion, 7/26/22, at 3. It states that it considered all factors and found that its decision was most swayed by the following:

- "Mother's willingness and efforts made to keep maternal and paternal grandparents actively involved in the Children's lives";

---

[6] **See also** 23 Pa.C.S.A. § 5328(a) ("In ordering any form of custody, the court shall determine the best interest of the child"); 23 Pa.C.S.A. § 5337(h) (stating the party proposing relocation has the burden of establishing that the relocation will serve the best interest of the child).

- 23 -

- the family had planned on a military life and had already lived in four states;

- "this type of travel enhances Children's tolerance of others and of new cultures and customs and creates new challenges and experiences";

- the children's school and activities and community will be similar;

- the maternal grandmother would provide additional childcare;

- the fellowship will make Mother more marketable when she leaves the Army;

- the children's need for stability in their community was alleviated by their youth and inherent ability to make friendships; and

- if they continue in their current career paths, Father has greater ability to travel to visit Mother's residence, in comparison to Mother's ability to travel to Father.

*Id.* at 4-7. The record supports these conclusions, and in light of them, the court's decision to award Mother primary custody is not unreasonable.

Father argues he has spent more hours with the children than Mother has, and the children need stability. However, both parties had equal custody for over a year before the hearing, and which parent has historically been the primary caretaker is but one custody factor, as is the children's need for stability. While Father asserts that he provides a higher percentage of direct care for the children when he exercises custody than Mother does, and would continue to do so, given the hours Mother will work during the fellowship, this again, is but one consideration for the court.

While Father characterizes the relocation as "temporary," because it is based on Mother's attending the one-year fellowship, Mother testified that the army would be restationing her regardless of the fellowship and would

continue to restation her every two or three years. The court clearly awarded Mother custody to allow her to continue to fulfill her commitment to the military for the foreseeable future.[7]

Father claims the record does not support that relocation will improve Mother's quality of life, because the fellowship will involve long-work hours and there was no testimony supporting an immediate financial benefit. However, Father ignores the intangibles, such as Mother's love for, and pride in, her career, as well as her long-term financial prospects following the fellowship. Father's reliance on **Speck**, 895 A.2d at 613, is thus misplaced. In that case, we found the relocation was based only on "the mother's cohabitation with the man she intended to marry." 895 A.2d at 613-14.

Although there is no financial need for the move, a party seeking relocation need not prove the move is financially necessary, or that there are no other job opportunities in the immediate vicinity. **Geiger v. Yeager**, 846 A.2d 691, 698 (Pa.Super. 2004). Although Father argues that Mother seeks the move for her own benefit, he fails to acknowledge that Mother had

_____

[7] We note, however, "all custody awards are temporary insofar as they are subject to modification by an ensuing court order any time that it promotes the child's best interest. Thus, by force of circumstances, no award of child custody is permanent regardless of whether the order is styled as interim or final." **J.M. v. K.W.**, 164 A.3d 1260, 1268 (Pa.Super. 2017); **see also Arnold v. Arnold**, 847 A.2d 674, 677 (Pa.Super. 2004) ("Child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child. . . . [The court] may always entertain an application for modification and adjustment of custodial rights") (quoting **Kassam v. Kassam**, 811 A.2d 1023, 1025 (Pa.Super. 2002)).

committed to military service before they even had children or dispute the reasonableness of Mother's motivation for moving to Fort Hood.

Father also argues that relocation was improper because the testimony indicates it would be only a lateral move for the children, while uprooting them and impeding their relationship with Father. However, Mother was not required to prove that the relocation will substantially improve the children's lives. Rather, she needed to show only that, in consideration of all factors, it is in the children's best interest.

Father's reliance on **Ketterer** is therefore also misplaced. While a substantial improvement to the children's lives was required under **Gruber v. Gruber**, 583 A.2d 434, 439 (Pa.Super. 1990), that decision has been supplanted by the statutory factors. **See Commonwealth v. Childs**, 142 A.3d 823, 832 (Pa. 2016). Moreover, the testimony supports the finding that there will be some benefits to the children, such as exposure to new experiences and more time with maternal grandmother. And, again, any immediate benefit to the children's quality of life was but one of several factors considered by the court.

To avoid having the children switch schools during the academic year or miss school days, the court had three options: (1) grant Mother's request to relocate and award her primary custody, (2) grant Mother's request to relocate but award primary custody to Father, or (3) deny the relocation. Either of the latter options would force Mother to leave the armed forces to have more than a minimal amount of custody time with her children. The court found that the

first option, however, will allow Mother to remain in the military and Father to exercise custody with some frequency. The court also found that Mother is more likely to facilitate visits with both sets of grandparents in comparison with Father, even after she and the children move farther away.

The court acknowledged that its decision to award Mother primary custody was not an easy one. We agree with that assessment. However, given the record, the order does not constitute a gross abuse of discretion, and we therefore affirm.[8] *See D.K.*, 102 A.3d at 478.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/21/2023

---

[8] We do not find an abuse of discretion on the present record, but any further request for relocation will of course be subject to review based on the record at that time.